Marc S. HERMELIN, Plaintiff,

v.

K–V PHARMACEUTICAL COMPANY,
Defendant.

Civil Action No. 6936–VCG.

Court of Chancery of Delaware.

Submitted: Jan. 5, 2012.
Decided: Feb. 7, 2012.

William D. Johnston, Kristen Salvatore DePalma, James M. Yoch, Jr., and Elisabeth S. Bradley, of Young Conaway Stargatt & Taylor, LLP, Wilmington, Delaware; Of Counsel: Jeffrey E. McFadden and Patrick F. Linehan, of Steptoe & Johnson LLP, Washington, DC, Attorneys for Plaintiff.

Anne C. Foster and Blake Rohrbacher, of Richards, Layton & Finger, P.A., Wilmington, Delaware; Of Counsel: Stephen H. Rovak and Stephen J. O'Brien, of SNR Denton US LLP, St. Louis, Missouri; Kenneth J. Pfaehler, of SNR Denton US LLP, Washington, DC, Attorneys for Defendant.

## OPINION

GLASSCOCK, Vice Chancellor.

No corporation can be a success unless led by competent and energetic officers and directors. Such individuals would be unwilling to serve if exposed to the broad range of potential liability and legal costs inherent in such service despite the most scrupulous regard for the interests of stockholders. This is the rationale behind the indemnification and advancement provisions of Delaware corporate law. Currently before me are several issues arising from those provisions and from a contract between the parties providing for the indemnification of the Plaintiff.

Delaware statutory law is largely enabling with respect to the indemnification rights of corporate officers and directors. The Delaware General Corporation Law ("DGCL") sets two boundaries for indemnification: The statute *requires* a corporation to indemnify a person who was made a party to a proceeding by reason of his service to the corporation and has achieved success on the merits or otherwise in that proceeding. At the other end of the spectrum, the statute *prohibits* a corporation from indemnifying a corporate official who was not successful in the underlying proceeding and has acted, essentially, in bad faith. In setting these broad boundaries, Delaware law furthers important public policy goals of encouraging corporate officials to resist unmeritorious claims and allowing corporations to attract qualified officers and directors by agreeing to indemnify them against losses and expenses they incur personally as a result of their

service.[1] Prohibiting the indemnification of unsuccessful "bad actors" also relieves stockholders of the costs of faithless behavior and provides corporate officials with an appropriate incentive to avoid such acts to begin with.

For any circumstance between the extremes of "success" and "bad faith," the DGCL leaves the corporation with the discretion to determine whether to indemnify its officer or director. Consequently, corporations routinely refine their indemnification obligations by charter, bylaw, or contract. Thus, because indemnification between the boundaries of "success" and "bad faith" is *permissive,* when a corporation has established by contract the indemnification rights of a corporate official, the agreement controls unless it conflicts with a mandatory statutory provision.

In this case, the Plaintiff, a former corporate officer, is suing the Defendant, his former employer, for advancement and indemnification in connection with several proceedings that arose out of regulatory and criminal investigations at the Defendant corporation. The Plaintiff and Defendant are parties to an Indemnification Agreement that generally makes mandatory what are permissive provisions for indemnification under the DGCL. The dispute centers around whether the Plaintiff succeeded on the merits of any of the aforementioned proceedings, thus entitling him to indemnification as a matter of law, or whether additional discovery is required to determine whether the Plaintiff acted in good faith, in which case he will be entitled to indemnification under the Indemnification Agreement. The parties have briefed

the matter, and I consider it submitted as on cross-motions for partial summary judgment. For the indemnification claims that require additional discovery regarding the Plaintiff's good faith, I set forth the scope of evidence relevant to that issue.[2] Finally, I address the remaining advancement issue in the case.

## I. FACTUAL BACKGROUND[3]

This case involves a number of indemnification and advancement claims by Plaintiff Marc S. Hermelin against his former employer, Defendant K–V Pharmaceutical Company ("KV"). Hermelin, who served as CEO of KV from 1975 to 2008 and held various positions on KV's Board of Directors from 1975 to 2010, seeks indemnification or advancement for several criminal, civil, and regulatory matters that arose following KV's distribution of oversized morphine sulfate tablets into the market. The facts giving rise to the proceedings at issue are more relevant to permissive indemnification than mandatory indemnification, the former of which requires that the indemnitee meet a "good faith" standard of conduct. Although, as I explain below, I cannot reach a decision on permissive indemnification on the current record, a brief summary of the undisputed background facts is useful.

In May 2008, two pharmacies notified KV that they had received oversized morphine sulfate tablets from KV. These tablets were manufactured by KV and distributed by ETHEX Corporation ("ETHEX"), a subsidiary of KV. KV began an internal investigation into the cause of the distribu-

---

1. *See Stifel Fin. Corp. v. Cochran,* 809 A.2d 555, 561 (Del.2002).

2. The parties have briefed the issue of what evidence is relevant to the Court's analysis of whether the Plaintiff's actions were in good faith.

3. The facts are not in dispute unless otherwise noted. The disputes that exist are immaterial to my findings in this Opinion.

tion of the oversized tablets. In the course of its investigation, KV discovered that it had manufactured additional oversized tablets, including propafenone, an anti-arrhythmic drug, and dextroamphetamine sulfate, a stimulant. KV notified the Food and Drug Administration ("FDA") of its discovery of the oversized morphine sulfate tablets, but it did not report its discovery of the other oversized pills.

Following these events and after receiving complaints from employees, KV's Audit Committee conducted an internal investigation and ultimately decided to terminate for cause Hermelin's employment as CEO of KV. The disclosure of Hermelin's termination in KV's Form 8–K filing precipitated an investigation by the U.S. Attorney's Office for the Eastern District of Missouri ("USAO") and regulatory actions by the FDA and the Office of Inspector General of the Department of Health and Human Services ("OIG"). Hermelin seeks advancement and indemnification for several proceedings arising out of these investigations and regulatory actions.

### A. Indemnification Matters

In his Verified Amended Complaint ("Complaint"), Hermelin sought a declaration that he was entitled to indemnification for six completed proceedings arising from

his conduct during his employment with KV. Two of those proceedings are no longer at issue,[4] as the matters have concluded and the Defendant has agreed not to seek claw-back on the amounts already advanced.[5] I summarize below the remaining four proceedings: the Audit Committee Matter, the Criminal Matter, the FDA Consent Decree Matter, and the HHS Exclusion Matter. In summarizing these proceedings, I focus on the charges Hermelin faced and the outcomes he achieved, as those are the principal facts upon which I evaluate whether Hermelin succeeded on the merits or otherwise.

Arguing that none of these matters justifies mandatory indemnification, KV invokes the "victory" of Pyrrhus of Epirus at the Battle of Asculum in 279 B.C. and asserts that any success by Hermelin in the underlying actions was a win as bad as a defeat.[6] Pyrrhic victories, however, where success in the matter comes at great sacrifice, are entitled to mandatory indemnification under Delaware law.[7] In any event, most of the "successes" alleged by Hermelin are not Pyrrhic wins at great cost, but instead losses akin to that of Lee at Appomattox, of which it may be said that the surrender on generous terms avoided an inevitable loss requiring supreme sacrifice, and was in that sense successful.

---

**4.** The two proceedings are the SEC Enforcement Matter and the Derivative Action, which are discussed at Verified Am. Compl. ¶¶ 68, 82, 85, 123, 131 [hereinafter "Compl. ——" ].

**5.** *See Hermelin v. K–V Pharm. Co.,* 2011 WL 6225377, at *2 (Del.Ch. Dec. 13, 2011) (denying the Plaintiff's motion for judgment on the pleadings on this ground).

**6.** As then-Chancellor Chandler aptly recounted in *Korn v. New Castle County:* "In 279 B.C., Pyrrhus of Epirus ostensibly defeated the Roman army at Asculum, but in the pro-

cess lost a devastating number of his own troops. Another such victory, he exclaimed, and I shall be ruined." 2007 WL 2981939, at *1 (Del.Ch. Oct. 3, 2007) (citing 1 PLUTARCH, *Pyrrhus, in* PLUTARCH'S LIVES 538–45 (John Dryden trans., Arthur Hugh Clough ed., Random House 2001) (1683)).

**7.** The Pyrrhic victor would be entitled to his *reasonable* fees and costs only. *See* 8 *Del. C.* § 145(c) ("[S]uch person shall be indemnified against expenses ... actually and reasonably incurred....").

### 1. The Audit Committee Matter[8]

In August 2008, KV's Audit Committee began an investigation into allegations by KV employees that Hermelin had refused to take appropriate action in response to the discovery that KV's manufacturing process had produced several oversized tablets. The Audit Committee retained independent counsel and purportedly conducted over fifty interviews and obtained and reviewed hundreds of thousands of documents. Hermelin retained his own counsel during the investigation. Following this investigation, the board decided in December 2008 to terminate Hermelin's employment for cause.[9] KV disclosed its decision in a December 5, 2008, Form 8–K filing.[10] This disclosure caught the attention of the USAO and other federal agencies.

### 2. The Criminal Matter

Soon after Hermelin's departure as CEO of KV, the USAO began an investigation into KV's release of oversized pills into the market. Based on Hermelin's position as a responsible corporate officer of both KV and ETHEX,[11] the USAO charged Hermelin with two federal strict liability misdemeanors, to which Hermelin pled guilty. The United States District Court for the Eastern District of Missouri ("District Court") ordered Hermelin to pay $1.9 million in criminal fines and forfeitures and sentenced him to a term "not less than 30 days" in the St. Louis County Jail. Hermelin spent fifteen days in jail, during which time many of his private conversations were recorded. The threatened public disclosure of those recordings

8. Hermelin seeks only permissive, rather than mandatory, indemnification for the Audit Committee Matter. Thus, I summarize the facts of the Audit Committee Matter simply as background for the other proceedings. Hermelin's entitlement to indemnification for the Audit Committee Matter depends on whether Hermelin acted in good faith with respect to the conduct that was at issue in that Matter and is therefore not addressed in this Opinion, which simply defines the scope of relevant evidence with respect to Hermelin's permissive indemnification claims.

9. The parties dispute whether Hermelin officially retired before his employment was terminated. Hermelin claims that he retired on December 1, 2008, and that the Board decided to terminate his employment on December 5; KV asserts that it terminated Hermelin's employment on December 1 and that this termination was merely confirmed on December 5. *See* Am. Answer Def. K–V Pharm. Co. ¶ 31. Nevertheless, because Hermelin does not seek mandatory indemnification for the Audit Committee Matter, I need not resolve this factual dispute at this time.

10. *See* Opening Mem. Law Pl. Marc S. Hermelin Regarding Applicable Legal Stds. and Appropriate Scope Disc. 14 ("[T]he [KV] Board ... acting upon the recommendation of the Audit Committee as a result of its

investigation with respect to a range of specific allegations involving, among other things, FDA regulatory and other compliance matters and management misconduct, terminated the employment agreement of Marc S. Hermelin, the Chief Executive Officer of the Company, 'for cause'.... In addition, the Board ... removed Mr. Hermelin as the Chairman of the Board ... and as [CEO], effective December 5, 2008. Mr. Hermelin is expected to remain a member of the Board ....") [hereinafter "Pl.'s Opening Indem. Mem. ——"].

11. The responsible corporate officer ("RCO") doctrine originates from the U.S. Supreme Court case of *United States v. Dotterweich*, 320 U.S. 277, 64 S.Ct. 134, 88 L.Ed. 48 (1943), in which the Supreme Court found corporate officers in positions of authority to be criminally liable on misdemeanor charges under the Food, Drug, and Cosmetic Act ("FDCA"). Affirmed in *United States v. Park*, 421 U.S. 658, 95 S.Ct. 1903, 44 L.Ed.2d 489 (1975), the RCO doctrine permits conviction, without a finding of fault, "of responsible corporate officials who, in light of [the high standard of care imposed by the FDCA], have the power to prevent or correct violations of [the FDCA's] provisions." *Id.* at 672–74, 676, 95 S.Ct. 1903.

is the subject of the Jail Records Matter described later in this Opinion.

Hermelin contends that the USAO could have brought more serious charges against him and that by pleading guilty to the two charged strict liability misdemeanors he avoided conviction on those harsher charges. On this basis, Hermelin argues that he was "successful on the merits or otherwise" in the Criminal Matter, and he seeks indemnification for his $1.9 million criminal penalty as well as his attorney fees and expenses. KV counters that Hermelin's incarceration and his payment of a large fine are *per se* indicators that Hermelin was not successful on the merits or otherwise.

### 3. *The FDA Consent Decree Matter*

The FDA Consent Decree Matter involved an investigation by the FDA, during December 15, 2008, to February 2, 2009, into whether KV's manufacturing facilities and processes were in compliance with current Good Manufacturing Practices ("cGMP"). The FDA sought an injunction generally requiring KV, Hermelin, and other named defendants to refrain from manufacturing, holding, or distributing any drug until certain cGMP and quality control measures were undertaken by the defendants.[12] At the time the FDA filed its complaint, Hermelin was no longer the CEO of KV, although he remained on KV's Board. On March 18, 2010, the FDA, KV, Hermelin, and the other defendants entered a consent decree whereby the defendants agreed to destroy certain drugs and refrain from manufacturing or distributing any drugs until KV and the other defendants complied with cGMP and other quality controls ("Consent De-

cree").[13] Notably, however, in the only paragraph of the Consent Decree referring to Hermelin, the Consent Decree clearly states that the provisions of the Decree do not apply to Hermelin so long as (1) KV's Board's resolutions to terminate Hermelin's employment remain in effect and (2) Hermelin "has no role in the decisionmaking, management, or operation of the Defendant KV that could affect the company's compliance with the [Food, Drug, and Cosmetic] Act, its implementing regulations, or [the] Decree."[14] The Consent Decree specifies that if the Board changes its resolutions or if Hermelin subsequently becomes involved with KV in the manner specified, the terms of the Consent Decree immediately apply in full force to Hermelin.[15]

Hermelin argues that because the FDA's investigation did not find him guilty of misconduct and because the Consent Decree does not apply to him, he achieved success in the FDA Consent Decree Matter. KV asserts that Hermelin was not successful because the Consent Decree effectively bars Hermelin from returning to KV, and such a result cannot be construed as "success."

### 4. *The HHS Exclusion Matter*

The HHS Exclusion Matter involved a determination by the OIG to exclude Hermelin from all federal healthcare programs. In May 2010, Hermelin received notice from the OIG of its intent to exclude him from all federal healthcare programs based on his association with ETHEX, a subsidiary of KV that had already been convicted of violating federal law. This exclusion would effectively prevent Hermelin from claiming payment under

---

**12.** *See* Pl.'s Opening Indem. Mem. Ex. 10, at 8–10.

**13.** *See generally id.* Ex. 9.

**14.** *Id.* Ex. 9, at 23.

**15.** *Id.*

any federal healthcare program for any items or services he rendered. The exclusion was to be based on federal law *permitting* the exclusion of an individual "(i) who has a direct or indirect ownership or control interest in a sanctioned entity and knows or should know . . . of the action constituting the basis for the conviction or exclusion . . . or (ii) who is an officer or managing employee . . . of such entity."[16] Hermelin's counsel met with OIG lawyers and submitted information in Hermelin's defense. Nevertheless, in October 2010, the OIG issued its formal determination to exclude Hermelin from all federal healthcare programs for twenty years.

Unlike Hermelin, KV faced the threat of *mandatory* exclusion by state Medicaid agencies based on its potential ownership of an excluded entity (ETHEX) and its being controlled by an excluded individual (Hermelin).[17] To avoid exclusion, KV made arrangements with the OIG whereby the OIG agreed to delay its exclusion of ETHEX on the condition that KV dissolve ETHEX immediately.[18] By dissolving ETHEX before it became excluded, KV could avoid its own mandatory exclusion for owning an excluded entity.

KV also faced mandatory exclusion due to Hermelin's controlling interest in the company. Hermelin contends that he was faced with a "Hobson's Choice"[19]: either divest himself of his ownership interest in KV and agree not to contest his own exclusion, or suffer the exclusion of KV.[20]

16. *See* 42 *U.S.C.* § 1320a–7(b)(15) (providing for permissive exclusion of individuals controlling sanctioned entities).

17. *See* Patient Protection and Affordable Care Act, Pub.L. No. 111–148, § 6502, 124 Stat. 119, 776 (2010) (repealed 2010) (current version at 42 *U.S.C.* § 1396a(a)) (requiring state Medicaid agencies to exclude from their programs entities that own excluded entities or are controlled by excluded persons or entities) [hereinafter "PPACA § 6502"]. Presumably, the same law that permitted the OIG to exclude Hermelin would have permitted the OIG to exclude KV; however, whether the OIG sought permissive exclusion against KV is unclear.

18. Def.'s Answering Br. Addressing Mand. Indem. and Scope Disc. Ex. 1.

19. Compl. ¶ 53. It has been pointed out to me that, technically speaking, Hermelin's purported dilemma was not a "Hobson's Choice," which refers to a choice between that which is offered or nothing at all; i.e., "take it or leave it." The term originates from Thomas Hobson (1544–1631), a Cambridge, England, livery stable operator who, after realizing that his strongest and fastest horses were more popular and consequently overused, instituted a rotation of horses whereby he presented his customers with a choice: take the horse nearest the stable door or none at all.

Hermelin's predicament, as it were, was instead a "Morton's Fork": a choice between two equally undesirable alternatives. The Morton's Fork gets its name from John Morton, the Archbishop of Canterbury and later Lord Chancellor under Henry VII. Morton justified taxing the rich as well as the poor on the grounds that subjects living in opulence could clearly afford to give generously, and subjects living frugally clearly had amassed savings and could thus give generously.

Neither a Hobson's Choice nor a Morton's Fork should be confused with a "Catch–22," *see* JOSEPH HELLER, CATCH–22, at 45–46 (Simon & Schuster paperback ed.2004) (describing a rule whereby a combat pilot declared insane by evaluation would be grounded, but the pilot must have requested the evaluation, and requests for evaluations were conclusive evidence of sanity because "[a]nybody who wants to get out of combat duty isn't really crazy"), or "Buridan's Ass," which satirizes moral determinism by hypothesizing an ass placed precisely between a stack of hay and a pail of water, where the ass, which is presumed to go to whichever is closer, cannot make a rational choice and thus dies of both starvation *and* dehydration.

20. Again, it is unclear whether KV faced only mandatory exclusion under PPACA § 6502 or whether the OIG also intended to pursue permissive exclusion under 42 *U.S.C.* § 1320a–7(b)(8); however, I need not resolve that factual dispute to reach my decision here.

Hermelin agreed to sell his KV shares and waive his right to appeal his exclusion, and the OIG agreed not to seek permissive exclusion of KV.[21]

Hermelin now argues that he should not be "punished" (by having to bear his own legal expenses) for falling on his proverbial sword, and that KV must indemnify him for his expenses in connection with the HHS Exclusion Matter.[22] Hermelin also claims to have achieved success because the OIG found no misconduct on his part and his exclusion was based solely on his association with ETHEX. KV responds that Hermelin was not successful because he suffered the worst punishment that the OIG could have bestowed upon him: an effective lifetime ban from federal health-care programs. KV also argues that although the divestiture of Hermelin's stock may have saved KV from mandatory exclusion, that should not change the calculus because the OIG negotiated Hermelin's exclusion separately from Hermelin's agreement to divest his stock and waive his right to appeal.

### B. Advancement for the Jail Records Matter

In addition to his claims for indemnification for the matters described above, Hermelin seeks advancement for his legal fees and expenses in prosecuting an action for injunctive relief against the St. Louis County Jail, where Hermelin was incarcerated following his conviction in the Criminal Matter. After pleading guilty on March 10, 2011, in the Criminal Matter to two federal strict liability misdemeanor charges, the District Court, in addition to imposing a $1.9 million fine and forfeiture, sentenced Hermelin to a jail term of "30 days or less" in the St. Louis County Jail. Hermelin spent fifteen days in jail, beginning March 14, 2011. During his jail stint, Hermelin received and conversed with several visitors, including his wife, other family members, friends, clergy, and his personal assistant. Hermelin did not discuss KV or its business during his stay. Rather, his conversations were of a private and personal nature and included discussions related to medical, religious, legal, and other private matters. These conversations were recorded per the jail's policy.

On April 25, 2011, a reporter at the *St. Louis Post–Dispatch* requested, under the purported authority of the Missouri Sunshine Law, a number of records from the jail pertaining to Hermelin's incarceration. According to Hermelin, the reporter requested these records because the *Post–Dispatch* was covering the demise of KV and Hermelin's role therein. The requested records included visitation logs, documents related to disciplinary findings or proceedings involving Hermelin's incarceration, and, at issue here, recordings of telephone calls made and received by Hermelin and conversations he had with visitors while incarcerated. On May 5, the Jail released to the newspaper everything except the recordings and stated its intent to release the recordings unless ordered otherwise. Hermelin filed suit to enjoin the release of the recordings, arguing that they were of a private and personal na-

---

**21.** *See generally* Pl.'s Opening Indem. Mem. Ex. 13 (covering the terms of a settlement agreement between Hermelin, KV, the OIG, and Sarah Weltscheff, Hermelin's wife).

**22.** The parties dispute whether the OIG would have sought the divestiture of Hermelin's ownership in KV but for the possibility of mandatory exclusion under PPACA § 6502; specifically, Hermelin argues that he should not lose his right to mandatory indemnification for having "saved" KV from exclusion. For the reasons discussed later in this Opinion, I find this factual dispute immaterial to whether Hermelin succeeded on the merits in the HHS Exclusion Matter.

ture. The Circuit Court of St. Louis County entered a permanent injunction on December 6, 2011, enjoining the release of the recordings by the jail on the grounds that the conversations were "purely private matters." [23]

Hermelin's Indemnification Agreement excludes indemnification for actions or portions thereof initiated by the indemnitee. Hermelin contends that he is nonetheless entitled to advancement because he effectively did not initiate the Jail Records Matter, but rather employed the only defense available to him when he was faced with the potential disclosure of sensitive private information. Additionally, Hermelin argues that his action for injunctive relief was the equivalent of a compulsory counterclaim and that the Indemnification Agreement does not except such claims from advancement. KV asserts that Hermelin's action for an injunction clearly falls within the exceptions that the Indemnification Agreement carves out of Hermelin's advancement rights. KV also argues that even if the Indemnification Agreement requires advancement for compulsory counterclaims, Hermelin's lawsuit was not a compulsory counterclaim because it was not "compulsory" as defined in the Federal Rules of Civil Procedure or Court of Chancery Rules.[24]

### C. Procedural Posture

The parties briefed the issue of whether Hermelin is entitled to advancement for the Jail Records Matter, and the parties presented oral argument on that issue on January 5, 2012. I now find, for the rea-

sons stated below, that the Indemnification Agreement expressly excludes advancement for the Jail Records Matter on the grounds that Hermelin initiated the action for injunctive relief.

■ I also decide here Hermelin's entitlement to mandatory indemnification and the scope of relevant, discoverable evidence going forward in regards to permissive indemnification. As I explain below, the court can determine an indemnitee's right to mandatory indemnification, which turns on whether the indemnitee succeeded in a proceeding on the merits or otherwise, on a record substantially more limited than that required to determine the indemnitee's right to permissive indemnification, which inquires into the indemnitee's good faith. Given this disparity in the evidence necessary for a determination on mandatory versus permissive indemnification, I requested briefing from the parties addressing whether the Plaintiff was "successful" in any of the proceedings for which he seeks indemnification—thus triggering mandatory indemnification under 8 *Del. C.* § 145(c)—and, for the proceedings for which mandatory indemnification is not available, what the proper scope of relevant evidence is in regards to permissive indemnification under 8 *Del. C.* § 145(a).[25] Having reviewed the parties' briefs and the record evidence, I find that, as a matter of law, Hermelin is *not* entitled to mandatory indemnification for the Criminal Matter and the HHS Exclusion Matter, but that he *is* entitled to mandatory indemnification for the FDA Consent Decree Matter. With respect to the scope of evidence relevant to permissive indemnifi-

---

23. Aff. Blake Rohrbacher, Esq. Supp. Def.'s Opening Br. Opp'g Advmt. Ex. P.

24. *See* Fed.R.Civ.P. 13(a); Ch. Ct. R. 13(a).

25. *See Hermelin v. K–V Pharm. Co.*, 2011 WL 5921647, at *1 (Del.Ch. Nov. 23, 2011) (directing the parties to "submit memoranda

addressing which, if any, of the Plaintiff's indemnification claims arise from proceedings in which the Plaintiff was 'successful on the merits,' thus triggering mandatory indemnification" and what "the proper scope of discovery [is] under section 145(a)").

cation in the Criminal, HHS Exclusion, and Audit Committee Matters, I find that discovery is limited to the conduct underlying those proceedings. I elaborate on these findings below.

## II. STANDARD OF REVIEW

Neither party in its papers has alleged that there are material issues of fact that prevent me from reaching a decision on the issues of advancement, mandatory indemnification, or the scope of relevant evidence for the purposes of permissive indemnification. Additionally, the parties agreed at Oral Argument on January 5, 2012, that their briefing on these issues should be treated as cross-motions for summary judgment.[26] I therefore deem these issues submitted for a decision based on the extant record.[27] A party is entitled to summary judgment where the record demonstrates that no genuine issue of material facts exists and that the movant is entitled to judgment as a matter of law.[28] Where only a portion of the action may be resolved on the record submitted, entry of partial summary judgment is appropriate.[29]

Hermelin and KV are parties to an Indemnification Agreement, the language of which provides the primary source of KV's indemnification obligations. The Indemnification Agreement provides that in any proceeding commenced to enforce Hermelin's right to indemnification, KV "shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption."[30] Additionally, where a proceeding to which Hermelin is a party "is resolved in any manner other than by adverse judgment against [Hermelin] ... it shall be presumed that [Hermelin] has been successful on the merits or otherwise.... Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence."[31]

## III. ANALYSIS

### A. Advancement for the Jail Records Matter

█ Delaware law authorizes corporations to advance expenses incurred by their officers or directors in defending any "action, suit or proceeding" for which indemnification is permitted.[32] Article IX, Section 1(e), of KV's Bylaws tracks this authorization and enables KV to agree to advance expenses to officers and directors.[33] Per the authorization of these permissive sources of indemnification and advancement rights, the Indemnification Agreement *mandates* advancement of Hermelin's expenses for certain matters. Because the Indemnification Agreement is the only source that places *mandatory* advancement obligations on KV, the Agreement provides the controlling language in my analysis here, except to the extent that it references or contravenes KV's Bylaws or the DGCL.[34]

---

26. Oral Arg. Tr. 7:24–8:6 (Jan. 5, 2012).

27. *See* Ch. Ct. R. 56(h).

28. *Id.* 56(c).

29. *See id.* 56(d).

30. Compl. Ex. B, at 8 (Indemnification Agreement § 8(b)) [hereinafter "Indemnification Agreement ——"].

31. Indemnification Agreement § 7(e)(iii).

32. *See* 8 *Del C.* § 145(e).

33. *See* Compl. Ex. A, at A–11 [hereinafter "KV Bylaws ——"] ("Expenses incurred in defending a civil or criminal action ... *may* be paid by [KV] in advance of the final disposition of such action...." (emphasis added)).

34. *See Levy v. HLI Operating Co., Inc.*, 924 A.2d 210, 226 n. 59 (Del.Ch.2007) ("Under [section] 145(f), a corporation may provide indemnification rights that go 'beyond' the

Section 4(a) of the Indemnification Agreement provides:

(a) *Except as otherwise provided in Section 3(b)(iv) of this Agreement,* the Company shall advance Expenses to Indemnitee [35] to the fullest extent permitted by the [DGCL] . . . if Indemnitee is or was a party or is or was threatened to be made a party to any Proceeding [36] *by reason of his or her Official Capacity* or by reason of anything done or not done by Indemnitee in his or her Official Capacity.[37]

Section 3(b)(iv) provides a key exception to indemnification and advancement: "Indemnitee shall receive no indemnification of Expenses . . . in connection with any Proceeding, *or part thereof* (including claims and permissive counterclaims) *initiated by Indemnitee* . . . unless the Proceeding (or part thereof) was authorized by [KV's] Board of Directors . . . ."[38]

Hermelin argues that this provision does not preclude advancement for the Jail Records Matter because he did not "initiate" that proceeding; rather, the *Post–Dispatch* initiated the proceeding when it sent a request for information to the Jail's Custodian of Records. Along similar lines, Hermelin argues that his claim for injunctive relief was akin to a compulsory counterclaim and points out that Section 3(b)(iv) implicitly does not exclude advancement for compulsory counterclaims.

Hermelin's argument that the *Post–Dispatch* or the Jail's Custodian of Records initiated the Jail Records Matter by threatening to release Hermelin's recorded private conversations simply misconstrues the language of Section 3(b)(iv). Section 3(b)(iv) not only excludes proceedings initiated by Hermelin, but also *"part[s]* . . . (including claims and permissive counterclaims)"* initiated by Hermelin.[39] Even as-

---

rights provided by . . . the other substantive subsections of [section] 145. At the same time, such indemnification rights provided by a corporation must be 'consistent with' the substantive provisions of [section] 145 . . . ." (quoting *Waltuch v. Conticommodity Servs., Inc.,* 88 F.3d 87, 91 (2d Cir.1996))).

**35.** The Indemnification Agreement defines "Indemnitee" as Hermelin. *See* Indemnification Agreement at 1 (describing an agreement "between [KV] . . . and Marc S. Hermelin ('Indemnitee')").

**36.** The Indemnification Agreement defines "Proceeding" broadly to include

any actual, threatened, pending or completed inquiry, investigation, action, suit, arbitration, or any other such actual or threatened action or occurrence, whether civil, criminal, administrative or investigative, including any appeal or petition resulting from such action or occurrence, . . . except a proceeding initiated by an Indemnitee . . . to enforce his or her rights under this Agreement.

Indemnification Agreement § 1(g). The parties do not dispute that any of the matters for

which Hermelin seeks indemnification are "Proceedings" under the Indemnification Agreement. Rather, the parties dispute whether Hermelin *initiated* the Jail Records Matter, for which he seeks advancement.

**37.** *Id.* § 4(a) (emphasis added). Section 1(f) of the Agreement defines "Official Capacity":

"Official Capacity" means Indemnitee's corporate status as an officer and/or director and any other fiduciary capacity in which Indemnitee serves the Company, its subsidiaries and affiliates, its employee benefit plans, and any other entity which Indemnitee serves in such capacity at the request of the Company's CEO, its Board of Directors or any committee of its Board of Directors. "Official Capacity" also refers to all actions which Indemnitee takes or does not take while serving in such capacity.

*Id.* § 1(f).

**38.** *Id.* § 3(b)(iv) (emphasis added). Section 3(b)(iv) carves out of its exception "judicial proceeding[s] . . . to enforce rights under this Agreement." *Id.*

**39.** *Id.* (emphasis added).

suming that the Custodian of Records or the *Post–Dispatch* "initiated" the Jail Records Matter and that Hermelin's lawsuit was a "defense" in that proceeding,[40] Hermelin is not entitled to advancement for any "part" of the Jail Records Matter that he initiated. The Jail Records Matter, or, from Hermelin's viewpoint, his "counterclaim" therein, therefore falls squarely within the exclusion in Section 3(b)(iv), an exclusion the parties bargained and contracted for. Whether such a contractual arrangement is good corporate policy is not a question before me.

In the alternative, Hermelin argues that his claim for injunctive relief embodied a compulsory counterclaim and that such claims are carved out of Section 3(b)(iv)'s exception. Assuming for the purposes of my analysis that Section 3(b)(iv) mandates advancement for compulsory counterclaims, I find that Hermelin's actions for injunctive relief are not sufficiently comparable to compulsory counterclaims to warrant advancement. The Court of Chancery Rules require a party to state in its pleading as a counterclaim any claim that that party has against the opposing party arising out of the transaction or occurrence that is the subject matter of the opposing party's claim.[41] Hermelin essentially argues that because his claim for injunctive relief arose out of the same transaction or occurrence as the request for the jail records, and because he would have lost his ability to vindicate his rights if he had not filed his claim, I should find that his claim for injunctive relief was akin to a compulsory counterclaim, and thus outside the ambit of Section 3(b)(iv).

This argument ignores the inherent framework within which a counterclaim becomes compulsory. Neither the Custodian of Records nor the *Post–Dispatch* filed a claim requiring a responsive pleading from Hermelin. Thus, there is no "subject matter of the opposing party's claim" from which Hermelin's purported compulsory counterclaim could arise.[42] Hermelin's situation was no different than that of any other person whose rights are infringed in such a way that warrants injunctive relief. Indeed, because courts do not grant injunctions without a showing of irreparable harm, any individual suing for injunctive relief by definition is faced with a situation where he must file for an injunction or lose the opportunity to vindicate his rights. Hermelin's proffered reading would thus in effect remove all claims for injunctive relief from the reach of Section 3(b)(iv).

---

**40.** Although I rest my decision on alternative grounds, Hermelin's argument that the Custodian of Records or the *Post–Dispatch* initiated the Jail Records Matter is not persuasive. Hermelin conceives of the records request and his action for injunctive relief as occurring within a continual "Proceeding," as that term is defined in Section 1(g) of the Indemnification Agreement, initiated by the *Post–Dispatch*. This argument fails to recognize the distinction between an act that gives rise to a chose in action and an act that actually initiates a proceeding. Just as a person threatening to disclose a trade secret does not *initiate* a proceeding by his former employer to enjoin that disclosure, just as an assault does not *initiate* an actual proceeding by the victim for tort damages, and just as the breach of a contract does not *initiate* a pro-

ceeding by the non-breaching party for specific performance, the records request did not *initiate* Hermelin's action for injunctive relief. Under Hermelin's interpretation, the Indemnitee could never be seen as having "initiated" a proceeding, even as a plaintiff, so long as he had in the first place a chose in action that he wished to vindicate. Although the records request may indeed have been a "Proceeding" under the broad definition of Section 1(g) of the Indemnification Agreement, Hermelin initiated a new "Proceeding" when he filed his claim for injunctive relief.

**41.** *See* Ch. Ct. R. 13(a).

**42.** *See id.*

I find it clear, however, that Section 3(b)(iv) covers and proscribes indemnification for such claims. Hermelin's abstract construction of "compulsory counterclaim" is simply unsupported by the contractual language, and the case law he cites does not support an extension of that term's definition beyond its definition in the Court of Chancery and Federal Rules. Because Section 3(b)(iv) covers Hermelin's claim for injunctive relief, he was required to obtain permission from KV's Board to pursue that action in order to receive advancement. Hermelin requested such permission and did not receive it; accordingly, his claim for advancement for the Jail Records Matter is denied.[43]

### B. Fees for Fees

Having determined that Hermelin is precluded by Section 3(b)(iv) from receiving advancement for the Jail Records Matter, Hermelin will ultimately be required to reimburse KV for any advancements made by KV to Hermelin for the prosecution of the Jail Records Matter portion of Count I of the Complaint. I leave it to the parties to reach an agreement as to what portion of the fees for fees advanced thus far, if any, covered the prosecution of Hermelin's attempted enforcement of his advancement right for the Jail Records Matter. If the parties are unable to resolve this issue, they should so notify me.

### C. Indemnification Claims

Hermelin seeks mandatory indemnification for the Criminal Matter, the HHS Exclusion Matter, and the FDA Consent Decree Matter. As discussed below, the central issue for mandatory indemnification is whether Hermelin was "successful on the merits or otherwise" in those matters. I find that Hermelin was successful only as to the FDA Consent Decree Matter, for which he is entitled to mandatory indemnification. For the remaining two matters—the Criminal Matter and the HHS Exclusion Matter—as well as the Audit Committee Matter (for which Hermelin does not seek mandatory indemnification), Hermelin may be entitled to permissive indemnification; however, as I discuss later in this Opinion, I cannot reach a determination on that issue on the present record.

### 1. Mandatory Indemnification

Section 145 of the DGCL generally empowers corporations with the discretion to determine when to advance expenses to or indemnify a corporate officer or director. Nonetheless, Section 145(c) of the DGCL *mandates* indemnification where "a present or former director or officer of a corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding"[44] in which that director or officer was made a party to such action "by reason of the fact that the person is or was a director [or] officer . . . of the corporation."[45] Section 1(c) of Article IX of KV's Bylaws tracks the language of DGCL § 145(c) almost exactly.

Section 5 of the Indemnification Agreement, entitled "Indemnification for Expenses for Successful Party," also tracks the language of DGCL § 145(c) and Article IX, Section 1(c), of KV's Bylaws:

---

**43.** Because I find that Hermelin's action for injunctive relief clearly falls within the exception to indemnification carved out by Section 3(b)(iv), I need not reach the issue, hotly contested by counsel, of whether Hermelin was made a party to the Jail Records Matter "by reason of" his Official Capacity.

**44.** *8 Del. C.* § 145(c).

**45.** *Id.* § 145(a).

Notwithstanding the limitations of any other provisions of this Agreement, to the extent that Indemnitee is *successful on the merits or otherwise* in defense of any Proceeding, or in defense of any claim, issue or matter therein, including, without limitation, the dismissal of any action without prejudice, or if it is ultimately determined that Indemnitee is otherwise entitled to be indemnified against Expenses, Indemnitee *shall* be indemnified against all Expenses actually and reasonably incurred in connection therewith. If Indemnitee is partially successful on the merits or otherwise in defense of any Proceeding, Indemnitee shall be indemnified against all Expenses actually and reasonably incurred in connection with each claim, issue, or matter that is successfully resolved on the merits or otherwise to the fullest extent permitted by law.[46]

For the purposes of this proceeding, the parties do not dispute that the three matters for which Hermelin seeks mandatory indemnification are covered "Proceedings." The key issue for mandatory indemnification under the DGCL, KV's Bylaws, and the Indemnification Agreement, is therefore whether Hermelin was "successful on the merits or otherwise" in these matters. If Hermelin was not "successful on the merits or otherwise," he will still be entitled to indemnification unless KV can show that his conduct underlying the matters for which he seeks indemnification does not satisfy the good faith standard required by DGCL § 145(a).[47]

The Indemnification Agreement provides additional clarification of the phrase "success on the merits or otherwise." Section 7(e)(iii) of the Agreement states:

> The Company acknowledges that a settlement or other disposition short of final judgment may be successful if it permits a party to avoid expense, delay, distraction, disruption and uncertainty. In the event that any action, claim or proceeding to which Indemnitee is a party is resolved in any manner other than by adverse judgment against Indemnitee (including, without limitation, settlement of such action, claim or proceeding with or without payment of money or other consideration) it shall be presumed that Indemnitee has been successful on the merits or otherwise in such action, suit or proceeding. Anyone seeking to overcome this presumption shall have the burden of proof and the burden of persuasion by clear and convincing evidence.

The parties disagree on how closely a court must scrutinize the outcome of a proceeding to determine whether the indemnitee was successful under Section 145(c). Both parties argue, in the first instance, that Hermelin's success or failure can be determined solely from the outcomes that occurred in each proceeding.

---

**46.** Indemnification Agreement § 5 (emphasis added).

**47.** *See* 8 *Del. C.* § 145(a) (permitting indemnification so long as the person "acted in good faith and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful"). Although I do not find it determinative in the matter before me, I note for completeness that the Indemnifica-

tion Agreement presumes that Hermelin is entitled to indemnification and places the burden on KV to overcome that presumption. *See* Indemnification Agreement § 8(b) (stating that in a proceeding brought by the Indemnitee to enforce his right to indemnification, the "Indemnitee shall be presumed to be entitled to indemnification under this Agreement and the Company shall, to the fullest extent not prohibited by law, have the burden of proof to overcome that presumption").

The parties contend in the alternative, however, that should I disagree with their respective positions on Hermelin's success or failure, I must allow additional discovery into the underlying facts of Hermelin's guilty plea in the Criminal Matter, the purpose of the FDA Consent Decree, and the negotiations behind the HHS Exclusion. KV even asserts that "whether the relevant governmental entity believed or intended Mr. Hermelin to be successful in the final results of each of those proceedings" should factor into my analysis.[48]

■ Such facts are beyond the scope of the inquiry required by Section 145(c). When determining success on the merits, this Court does not look "behind the result."[49] Rather, where the *outcome* of a proceeding signals that the indemnitee has avoided an adverse result, the indemnitee

has succeeded "on the merits or otherwise," and further inquiry into the "how" and "why" of the result is unnecessary.[50] Whether the prosecution, plaintiff, or investigating government agency "intended" for the indemnitee to be "successful" is clearly irrelevant. One can only imagine the difficulty an indemnitee would face in eliciting testimony from a prosecutor that she intended for the defendant/indemnitee to "succeed" when she negotiated the plea agreement. Delaware law does not require such abstractions; instead, the only relevant consideration is "what the result was, not why it was."[51] In determining whether indemnification is mandatory under Section 145(c), this Court looks strictly at the outcome of the underlying action.[52] This approach is consistent with the language of the DGCL and avoids, where possible, prolonged and expensive discov-

**48.** Def.'s Opening Br. Addressing Mand. Indem. and Scope Disc. at 8 [hereinafter "Def.'s Opening Indem. Br. ——"].

**49.** *See Merritt–Chapman & Scott Corp. v. Wolfson*, 321 A.2d 138, 141 (Del.Super.Ct.1974).

**50.** *See Stockman v. Heartland Indus. Partners, L.P.*, 2009 WL 2096213, at *10 n. 44 (Del.Ch. July 14, 2009) (" '[S]uccess' under § 145(c)[ ] does not mean moral exoneration. Escape from an adverse judgment or other detriment, for whatever reason, is determinative." (quoting *Waltuch*, 88 F.3d at 96)); *Zaman v. Amedeo Holdings, Inc.*, 2008 WL 2168397, at *22 (Del.Ch. May 23, 2008) ("The success on the 'merits or otherwise' standard is one that grants indemnification to corporate officials even when they have not been adjudged innocent in some ethical or moral sense.").

**51.** *Waltuch*, 88 F.3d at 96 (citing *Merritt–Chapman*, 321 A.2d at 141). In *Zaman v. Amedeo Holdings, Inc.*, this Court noted that some prior cases had held that "if similar claims are pending in two forums simultaneously, dismissal of one case so that the other case can go forward does not constitute success for purposes of § 145(c)." 2008 WL 2168397, at *22 (citing *Galdi v. Berg*, 359 F.Supp. 698, 702 (D.Del.1973)). This should

not be read as an exception to the rule that this Court will not look beyond the outcome of a proceeding, but rather as a recognition of the identity between a dismissal on those grounds and a ruling short of a final disposition. Indeed, indemnification under any provision of the DGCL is improper pending the final disposition of the underlying proceeding. *See Paolino v. Mace Sec. Int'l, Inc.*, 2009 WL 4652894, at *4 (Del.Ch. Dec. 8, 2009) ("It is generally premature to consider indemnification prior to the final disposition of the underlying action.") (citing *Sun–Times Media Group, Inc. v. Black*, 954 A.2d 380, 401–08 (Del.Ch.2008); *Simon v. Navellier Series Fund*, 2000 WL 1597890, at *9 (Del.Ch. Oct. 19, 2000)).

**52.** *See Stockman*, 2009 WL 2096213, at *11 (concluding that the indemnitees were successful because they achieved a dismissal without prejudice); *Zaman*, 2008 WL 2168397, at *21–*24 (determining that the indemnitee was successful on the merits because all of the counts in the complaint were dismissed); *FGC Holdings Ltd. v. Teltronics, Inc.*, 2007 WL 241384, at *10 (Del.Ch. Jan. 22, 2007) (finding that "[a] fair reading of the Memorandum Opinion shows that [the indemnitee] did succeed 'on the merits or otherwise' ").

ery into the facts behind a particular dismissal, settlement, or plea. Thus, in analyzing each of the indemnification matters here, I examine what Hermelin was charged with or formally accused of, and I compare that with the result Hermelin actually achieved.

### a. Hermelin Is Not Entitled to Mandatory Indemnification for the Criminal Matter

 It is clear that Hermelin was not successful in the Criminal Matter. The USAO charged Hermelin with two federal strict liability misdemeanors, and Hermelin pled guilty to both charges.[53] Because of Hermelin's guilty plea, the Court ordered Hermelin to pay $1.9 million in fines and forfeitures and sentenced him to a maximum of thirty days in jail. Hermelin argues that a guilty plea, even if accepted by a court, is not an adverse judgment and that by pleading guilty, he was able to "avoid expense, delay, distraction, disruption, and uncertainty," and that he was therefore "successful" by the terms of Section 7(e)(iii) of the Indemnification Agreement.[54]

It is well-settled that, in a criminal proceeding, anything less than a conviction constitutes "success" for the purposes of DGCL § 145(c).[55] Here, however, Hermelin pled guilty to every charge against him, paid a substantial fine, and served time in the St. Louis County Jail. This was not a successful outcome.

Additionally, I find Hermelin's invocation of Section 7(e)(iii) to be unpersuasive. That provision states that a disposition short of final judgment *may* be successful in some circumstances. Section 7(e)(iii) is a reflection of established Delaware precedent that "success" under DGCL § 145(c) "does not mean moral exoneration. Escape from adverse judgment or other detriment, for whatever reason, is determinative."[56] For example, in *Merritt–Chapman & Scott Corp. v. Wolfson*, the Court found that the indemnitees were successful on the merits of and entitled to partial indemnification for the charges against them that had been dismissed, even though those dismissals occurred as part of a plea deal where the indemnitees pled guilty to another charge.[57]

Hermelin is unsuccessful in drawing a parallel between his case and *Merritt–Chapman*. Unlike the indemnitees in *Merritt–Chapman*, Hermelin did not achieve the dismissal of some charges against him for the price of pleading guilty to other charges. Rather, Hermelin was charged with two strict liability misdemeanors, and he pled guilty to both charges. Hermelin insists that the USAO could have charged him with more serious crimes, an assertion he bases on the

---

53. *See* Pl.'s Opening Indem. Mem. Exs. 7, 8.

54. The indemnification-promoting provisions of Section 7(e)(iii) relied on by Hermelin and discussed below provide the Indemnitee with the presumption of success only where the matter is resolved "in any manner other than by adverse judgment against Indemnitee." Indemnification Agreement § 7(e)(iii). Although I find that, in any case, the result for Hermelin here was not a success, I note that a guilty plea accepted by the court thereby becomes a conviction and an adverse judgment.

55. *See Stockman*, 2009 WL 2096213, at *10 ("An indemnitee in a criminal proceeding is successful any time she avoids a conviction...."); *Merritt–Chapman*, 321 A.2d at 141 ("Success is vindication. In a criminal action, any result other than conviction must be considered success.").

56. *Stockman*, 2009 WL 2096213, at *10, n. 44 (quoting *Waltuch*, 88 F.3d at 96).

57. *Merritt–Chapman*, 321 A.2d at 140–41.

charges leveled against ETHEX, but that due to successful negotiations between Hermelin's counsel and the USAO, the USAO only charged Hermelin with two misdemeanors. The substance of these negotiations, if in fact they occurred, is beyond the scope of a determination of success on the merits under Section 145(c). Just as this Court will not look behind the result of a dismissal, it will not judge the actual outcome of a proceeding against the universe of crimes with which the indemnitee could have been charged. The proper analysis instead considers the outcome achieved by the indemnitee in light of the formal charges or claims against him.

In the criminal context, the dismissal of a charge equates with success in most instances, while a conviction (including a conviction resulting from a plea of guilty or *nolo contendere* ) equates with failure. Here, Hermelin pled guilty to all charged offenses, paid a large fine, and received a jail sentence. Although by pleading guilty Hermelin conceivably avoided some "expense, delay, distraction, disruption, [or] uncertainty," he cannot be said to have "succeeded" simply because of that fact. If an indemnitee could "succeed" by pleading guilty on all counts, those indemnitees utterly without a defense to any charge would nonetheless be "successful" on the merits, thus circumventing the permissive indemnification provisions of DGCL §§ 145(a)-(b). Hermelin did not achieve success on any of the charges against him, and for that reason, he is not entitled to mandatory indemnification for the Criminal Matter.

### b. Hermelin Is Not Entitled to Mandatory Indemnification for the HHS Exclusion Matter

 Hermelin also did not succeed on the merits in the HHS Exclusion Matter.

In a May 19, 2010, letter, the OIG informed Hermelin that it was considering excluding him from federal healthcare programs, and the OIG invited him to submit information in his defense.[58] After considering the information submitted by Hermelin in his defense, the OIG decided to exclude Hermelin for twenty years from federal healthcare programs. Hermelin concedes that, because of his age, this was effectively a lifetime ban.[59] Comparing the potential outcome Hermelin faced (effectively a lifetime exclusion from federal healthcare programs) and the actual outcome of the proceeding (Hermelin's twenty-year exclusion from federal healthcare programs), Hermelin clearly did not succeed on the merits of the HHS Exclusion Matter.

Hermelin nonetheless contends that he was successful on the merits because the OIG's determination did not require Hermelin to make any payment. Additionally, Hermelin argues that he entered into the settlement agreement with the OIG to prevent the exclusion of KV, and that because of this it would be inequitable to find that by doing so he forfeited his right to mandatory indemnification. Finally, Hermelin asserts that his settlement with the OIG, in which he purportedly gave up his right to appeal his exclusion in return for the OIG's agreement not to exclude KV, allowed Hermelin to "avoid expense, delay, distraction, disruption, and uncertainty," and thus the settlement was the type of "disposition short of final judgment" for which the Indemnification Agreement mandates indemnification.

All of these arguments attempt to sidestep what is in actuality a very simple inquiry: in the proceeding in which the

---

**58.** Pl.'s Opening. Indem. Mem. Ex. 11.

**59.** Compl. ¶ 53.

OIG threatened Hermelin with exclusion from federal healthcare programs, did Hermelin "succeed" when the OIG decided to exclude him for twenty years (effectively, for life)? It is clear that he did not. Moreover, I find irrelevant the fact that Hermelin purportedly gave up his right to appeal his exclusion and divested himself of his KV stock in return for the OIG's promise not to exercise permissive exclusion of KV. Hermelin argues that equity should mandate indemnification in this context, but his right to indemnification, if it exists, arises from statute and contract, not equity.

Admittedly, although the divestiture of Hermelin's ownership in KV appears to have been necessary to avoid the *mandatory* exclusion of KV, the record also provides some support for the inference that the OIG sought a waiver of Hermelin's right to appeal his exclusion only in exchange for its promise not to *permissively* exclude KV. Furthermore, good corporate policy may support the indemnification of officers who, in good faith, "take one for the company" to avoid bringing down the whole enterprise. My task here, however, is not to pass judgment on KV's corporate policy, but rather to determine, as a matter of law, whether Hermelin is entitled to *statutorily-mandated* indemnification on the basis of his having "succeeded on the merits." That determination is limited to the action the OIG took against Hermelin and the outcome of that action. It is clear from the timing and content of the letters from the OIG to Hermelin that the OIG's plan to exclude Hermelin was independent of any action it took toward KV. Thus, Hermelin's voluntary agreement to undergo additional hardship to protect KV is

irrelevant. Even if such an agreement were relevant to my analysis, and regardless of what sound corporate policy may dictate, "taking one for the team" and "falling on one's sword" do not equate to "success on the merits or otherwise" for the indemnitee. On the contrary, it is the company that "succeeds" in such an instance, albeit at the indemnitee's expense. Whether the company chooses to indemnify its officer in such cases is a matter of corporate policy, and DGCL §§ 145(a)-(b) authorize corporations to establish that policy should they so desire.

### c. Hermelin Is Entitled to Mandatory Indemnification for the FDA Consent Decree Matter

██ I find that Hermelin was "successful on the merits or otherwise" with respect to the FDA Consent Decree Matter. As discussed above, in determining "success" for the purposes of Section 145(c), I compare the charges Hermelin faced with the outcome he achieved, and I do not look "behind the result." In essence, the Consent Decree imposed no new restrictions, obligations, or penalties against Hermelin, and thus, in avoiding an adverse result, Hermelin achieved "success."[60]

The FDA's Complaint for Permanent Injunction sought an injunction generally prohibiting KV, ETHEX, Hermelin, and other defendants from manufacturing, holding, or distributing any drug until the defendants brought their operations into conformity with cGMP and the FDCA.[61] Although the FDA's Complaint sought to impose these restrictions on Hermelin, the restrictions contained in the Consent Decree entered into by the parties did not

---

60. *See Waltuch,* 88 F.3d at 96 ("Escape from an adverse judgment or other detriment, for whatever reason, is determinative."); *Merritt–Chapman,* 321 A.2d at 141 ("Going behind the result . . . is [not] authorized by subsection (c). . . .").

61. Pl.'s Opening Indem. Mem. Ex. 10, at 8–10.

place any additional restrictions on Hermelin. The only reference to Hermelin in the body of the Consent Decree occurs at Paragraph 24, which states that the provisions of the Consent Decree do not apply to Hermelin unless *KV's Board* alters its resolutions terminating Hermelin's employment or Hermelin otherwise "assume[s] any role in the decisionmaking, management, or operation of KV that could affect the company's compliance with the Act, its implementing regulations, or [the] Decree." [62]

KV mischaracterizes Paragraph 24 of the Consent Decree as imposing a "perpetual ban" on Hermelin from any management or operational role in KV.[63] What Paragraph 24 actually provides, however, is that if Hermelin resumes any management role that could affect KV's compliance with the Consent Decree, the restrictions on KV and the other defendants *also* apply to Hermelin. This provision is practical and unsurprising. KV's Board terminated Hermelin's employment before the FDA filed its Complaint, and thus because Hermelin did not hold a managerial position in KV, there was no reason for the Consent Decree to apply to him. It would be absurd to exclude Hermelin from the restrictions of the Consent Decree yet nonetheless allow him to return to his old job free from the restrictions in place against the rest of KV and its managers. Paragraph 24 simply prevents this absurdity. In any event, in avoiding a personally negative result in connection with the Consent Decree, Hermelin succeeded in this Matter.

## 2. *Evidence Relevant to Permissive Indemnification*

The parties disagree on what evidence is relevant to a good faith analysis under Section 145(a) and have briefed the issue. In the interests of efficiency, I address the matter here. Where a corporate officer or director is not "successful on the merits or otherwise," Sections 145(a) and (b) of the DGCL *permit* a corporation to indemnify that person so long as "the person acted in *good faith* and in a manner the person reasonably believed to be in or not opposed to the best interests of the corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe the person's conduct was unlawful." [64] Here, however, KV's Bylaws and the Indemnification Agreement mandate indemnification where it is permissive under the DGCL.[65] Thus, the distinction is not "mandatory" versus "permissive" indemnification, but rather what standard I must employ in determining Hermelin's entitlement.

While statutorily mandated indemnification looks only to "success on the merits or otherwise" and can usually be determined based on the relevant court documents of the underlying action, statutorily permissive indemnification requires a determination as to whether Hermelin acted in good faith with respect to his conduct that led to the underlying action. The latter determination requires additional discovery to supplement the present record of this case, and I now address the scope of evidence

62. *Id.* Ex. 9, at 23.

63. Def.'s Opening Indem. Br. at 7.

64. *8 Del. C.* § 145(a) (emphasis added).

65. *See* KV Bylaws, art. IX, §§ 1(a)-(b) (following the language of DGCL §§ 145(a)-(b) ex-

cept replacing "shall have the power to" with "shall"); Indemnification Agreement § 3(a) ("Except as otherwise provided in this Agreement, the Company *shall* indemnify Indemnitee *to the fullest extent permitted by the General Corporation Law....*" (emphasis added)).

relevant to the issue of Hermelin's good faith.

Based on the briefs submitted by the parties and my own research, no Delaware case has squarely addressed what evidence is relevant to an inquiry into whether an indemnitee acted in good faith for the purposes of permissive indemnification under DGCL §§ 145(a) and (b).[66] Section 7(e)(iii) of the Indemnification Agreement does, however, provide a starting point for my analysis:

> The termination of any Proceeding or of any claim, issue or matter therein, by judgment, order, settlement or conviction, or upon a plea of *nolo contendere* or its equivalent, shall not ... *of itself* adversely affect the right of Indemnitee to indemnification or create a presumption that Indemnitee did not act in good faith and in a manner which Indemnitee reasonably believed to be in or not opposed to the best interests of the Company or, with respect to any criminal Proceeding, that Indemnitee had reasonable cause to believe that Indemnitee's conduct was unlawful.[67]

This provision clearly establishes that the particular outcome of a proceeding does not itself create a presumption that the indemnitee had a "non-indemnifiable state of mind."[68] Nonetheless, if the prosecution or the plaintiff in the underlying proceeding established that the indemnitee acted in bad faith, particularly through a showing that the indemnitee knew that his actions were damaging to the company or that his conduct was unlawful, "that would be conclusive evidence that the [indemnitee] is not entitled to indemnification."[69] Treating a finding of "bad faith" in an underlying proceeding as conclusive evidence of a non-indemnifiable state of mind in the related proceeding for indemnification under DGCL § 145(a) is simply a fundamental application of *res judicata.*

Beyond these basic formulations, there is a dearth of case law addressing the scope of relevant evidence with respect to good faith under Section 145(a). In *Stockman v. Heartland Industrial Partners, L.P.,* then–Vice Chancellor Strine acknowledged that

> [t]he language of §§ 145(a) and (b) applies comfortably only to cases where there has been a finding that the party seeking indemnification has violated some legal or equitable duty to someone, the party has made an admission of culpability, or the party has settled a case by making a payment. In the first two of these situations, there is a strong basis to believe the indemnitee acted against the interests of the corporation or society, and therefore providing indemnification would dampen the incentives of corporate officials to comply with their legal and fiduciary duties, a

---

**66.** The scope of discovery is set forth in the Court of Chancery Rules and includes

> any matter, not privileged, which is *relevant* to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents or other tangible things and the identity and location of persons having knowledge of any discoverable matter.

Ch. Ct. R. 26(b)(1) (emphasis added). Here, I address the scope of evidence "relevant to the subject matter involved in the pending action," i.e., Hermelin's good faith or lack thereof.

**67.** *Id.* § 7(e)(iii) (emphasis added). Section 7(e)(iii) tracks the language found at 8 *Del. C.* § 145(a).

**68.** *Cf. Sun–Times Media Group,* 954 A.2d at 401 n. 83.

**69.** *Id.*

result at odds with public policy. Moreover, in these situations, there will be a judicial record developed in a plenary proceeding regarding the underlying conduct which can serve as a basis for evaluating whether the indemnitee met the §§ 145(a) and (b) standard for good faith and law compliance.[70]

The third situation, settlement with a payment, is more problematic, as a settled case will rarely contain "a judicial record developed in a plenary proceeding." Thus, additional discovery—in some instances mimicking the very litigation avoided by the settlement—may be required to permit a determination on whether the indemnitee acted in good faith. As the *Stockman* Court noted, however, "there has been precious little application of the §§ 145(a) and (b) standard" in the case of settlements "because indemnitees typically work with the corporation, its lawyers, and insurers in resolving cases."[71] Neither party in *Stockman* could point to any cases in which this Court examined whether an indemnitee who settled a case satisfied the good faith requirement of §§ 145(a) and (b).[72] "After all," the Vice Chancellor remarked, "parties seek to settle cases in order to obtain peace and end further costs, not to kick the litigation can down the road."[73]

The matters for which Hermelin seeks indemnification present similar challenges, as none of the matters contained a finding that Hermelin acted in bad faith or an admission of culpability by Hermelin. The Criminal Matter resulted in a guilty plea to two strict liability misdemeanors. Given the lack of culpability inherent in a guilty plea to a strict liability offense, and since Section 7(e)(iii) of the Indemnification Agreement precludes such a plea from creating, of itself, a presumption that Hermelin had a non-indemnifiable state of mind, the record is inadequate with respect to Hermelin's conduct underlying the Criminal Matter. The HHS Exclusion Matter similarly did not contain a finding that Hermelin acted in bad faith; rather, Hermelin's exclusion was based on his association with ETHEX. Finally, in regards to the Audit Committee Matter, although KV's Board's decision to terminate Hermelin's employment "for cause" was allegedly based on Hermelin's willful misconduct, the current record contains scant evidence in support of that allegation; thus, the parties must supplement the record before I can make a determination under Section 145(a).

I find that a plenary trial is required on the issue of whether Hermelin "acted in good faith and in a manner [he] reasonably believed to be in or not opposed to the best interests of [KV], and, with respect to any criminal action or proceeding, had no reasonable cause to believe [his] conduct was unlawful."[74] The evidence relevant to that issue is limited to Hermelin's conduct underlying the proceedings for which Hermelin seeks indemnification. Thus, for the Criminal and HHS Exclusion Matters, discovery is limited to facts related to KV's and ETHEX's production of oversized tablets, including the morphine sulfate, dextroamphetamine sulfate, and propafenone tablets, as well as Hermelin's actions in response to their production.

---

70. *Stockman*, 2009 WL 2096213, at *15.

71. *Id.* at *16.

72. *Id.*

73. *Id.*

74. Hermelin shall be presumed to have satisfied the standard of conduct required for indemnification under Section 145(a), and KV "shall ... have the burden of proof to overcome that presumption." Indemnification Agreement § 8(b).

For the Audit Committee Matter, however, the discoverable evidence includes facts related to the allegations made by KV employees that triggered the investigation of Hermelin as well as any other instances of misconduct on the part of Hermelin that factored into the Board's decision to terminate Hermelin's employment.

Facts unrelated to the aforementioned activities are outside the scope of relevant evidence. This should be fairly straightforward for the Criminal Matter and the HHS Exclusion Matter, as the relevant facts are those related to the formal charges and allegations made against Hermelin in those matters. In a consistent fashion, I limit discovery into the Audit Committee Matter to facts related to Hermelin's conduct underlying the Audit Committee's investigation and KV's Board's decision with respect to Hermelin's employment. Presumably there will be substantial overlap between Hermelin's conduct underlying the Criminal and HHS Exclusion Matters and the complaints made by KV or ETHEX employees to KV's Board, as those complaints purportedly focused on Hermelin's failure to respond appropriately to KV's manufacturing of oversized tablets, which of course brought about the Criminal and HHS Exclusion Matters. It appears, however, that the Audit Committee based its decision to terminate Hermelin's employment on additional misconduct by Hermelin, such as past confrontations with the FDA.[75] Yet unlike the other matters at issue, the Audit Committee Matter did not involve formal charges or civil allegations (beyond the employee complaints that triggered the investigation); likewise, the record does not demonstrate the considerations which led KV's Board to terminate Hermelin's employment. In order to show that Hermelin is not entitled to indemnification, it will be up to KV to demonstrate that, in deciding to remove Hermelin, the Audit Committee relied on an incident in which Hermelin's actions constituted actual bad faith. The facts of any such incidents relied upon by the Audit Committee are those relevant to whether Hermelin is entitled to indemnification for the Audit Committee Matter.[76]

In limning the relevancy issues as I have, I reject Hermelin's argument that discovery on the issue of good faith should be limited to the records established in the matters for which he seeks indemnification. Hermelin's suggested scope, which he generally limits to the papers and transcripts filed in the underlying proceedings, more closely resembles what this Court will consider in determining "success on the merits or otherwise" under Section 145(c). Unlike Section 145(c), Section 145(a) requires a finding that the indemnitee did not act in bad faith, a fact-intensive inquiry that will most likely require a trial and credibility determinations. The disparity between the relevant evidence, respectively, under Sections 145(a) and (c) is, of course, the reason I decided to resolve

---

**75.** *See* Pl.'s Opening Indem. Mem. Ex. 14 (reporting that the Audit Committee investigated "a range of specific allegations involving, among other things, FDA regulatory and other compliance matters and management misconduct").

**76.** Hermelin contends that discovery "reaching back far before the underlying proceedings and relating to areas having nothing to do with the bases on which each of the subject proceedings was resolved, is inappropriate, unnecessary, and inconsistent with . . . a proper evidentiary record to evaluate the standard of conduct under Sections 145(a) and (b)." Pl.'s Opening Indem. Mem. at 46–47. To the extent that Hermelin's alleged earlier incidents of misconduct factored into KV's Board's decision to fire Hermelin, however, those earlier incidents are directly relevant to whether Hermelin met the "good faith" standard of conduct.

issues of mandatory indemnification in a summary fashion.

Moreover, the cases Hermelin cites do not support his argument for limited discovery. To be sure, *Stockman* found that "a judicial record developed in a plenary proceeding ... can serve as a basis for evaluating whether the indemnitee met the §§ 145(a) and (b) standard for good faith and law compliance." [77] Here, however, it is the very absence of such judicial records from the underlying proceedings that necessitates additional discovery. *Stockman* did not hold that discovery for permissive indemnification is limited to the judicial record of the underlying proceeding; rather, it simply provided that where a plenary judicial record exists for the underlying proceeding, re-litigation of the issue of good faith will often be unnecessary. The other cases cited by Hermelin do not support his argument for similar reasons. [78]

## CONCLUSION

For the foregoing reasons, I find that the Plaintiff is not entitled to advancement for the Jail Records Matter; is not entitled to mandatory indemnification for the Criminal Matter or the HHS Exclusion Matter; is entitled to mandatory indemnification for the FDA Consent Decree Matter; and that the evidence relevant to the Plaintiff's claims for permissive indemnification is limited to the Plaintiff's conduct, and the facts related to that conduct, underlying the proceedings for which indemnification is sought.

Although I rule in favor of KV on most of the indemnification and advancement issues, it strikes me that it is KV who has won what may prove a Pyrrhic victory. As I have discussed above, there is limited Delaware case law addressing what evidence is relevant to the standard of conduct requirement in DGCL § 145(a). I suspect that this lack of case law is owed less to the fact that companies never face claims for permissive indemnification and more to the fact that, where, as here, it is clear that the employee's right to indemnification turns on "good faith," economics militate in favor of resolving the matter outside of court, given the costs associated with a plenary trial on the indemnitee's conduct. [79] The economic incentive to set-

---

77. *Stockman*, 2009 WL 2096213, at * 15.

78. *See Charter Commc'ns, Inc. v. McCall*, 2005 WL 3107702, at *4 (E.D.Mo. Nov. 18, 2005) (finding that the indemnitee had not met the required standard of conduct for indemnification because he had admitted to "knowing[ ] and willful[ ] participat[ion] in a scheme to defraud" in his plea agreement); *Maiss v. Bally Gaming Int'l, Inc.*, 1996 WL 732530, at *1 (E.D.La. Dec. 12, 1996) (entering summary judgment in favor of the indemnitee because the indemnitee presented, by way of a lengthy affidavit, "*undisputed* facts that [he] acted in good faith and in a manner he believed to be in and not opposed to the best interests of [the company] and that he had no reasonable cause to believe that his conduct was unlawful at all relevant times" (emphasis added)). An earlier ruling denying a motion to dismiss in the *Maiss* case actually supports broad discovery:

> [P]ermissive indemnification is dependent on [the indemnitee's] good faith and knowledge and Section 145(a) prohibits a presumption arising from the fact of a conviction alone.... At the same time, [the indemnitee] has pleaded guilty to a crime with elements that include knowledge of the actual commission of a felony and an affirmative act to conceal the crime.... The indemnity agreement contemplates judicial determination in such a situation, and *such a determination must consider all the facts germane to the dispute.*
>
> *Maiss v. Bally Gaming Int'l, Inc.*, 1996 WL 288290, at *2 (E.D.La. May 29, 1996) (emphasis added) (citation omitted).

79. In many instances, of course, the indemnitee remains an employee, and thus the interests involved are more nearly aligned than they are in this case.

tle would seem particularly compelling where the parties have entered into an indemnification agreement, as they have here, that requires the company, at least initially, to foot both parties' costs on its own.

If the parties wish, they can certainly conduct discovery and present evidence at trial on the issue of good faith. To be sure, we will essentially be conducting the litigation the parties have thus far avoided through settlements, consent decrees, and plea agreements. I leave it to the parties to determine whether the elusive joys and potential benefits of such litigation outweigh the substantial costs that will result.

Counsel shall confer and submit a form of order consistent with this Opinion.