NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 19a0323n.06

Case No. 18-3217

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

FILED
Jun 25, 2019
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| AUTUMN LEE TANGAS, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR |
| | ) | THE NORTHERN DISTRICT OF |
| INTERNATIONAL HOUSE OF PANCAKES | ) | OHIO |
| LLC; DINE EQUITY, INC., | ) | |
| | ) | |
| Defendants-Appellees. | ) | |
| | ) | |

_____/

Before: MERRITT, DAUGHTREY, and STRANCH, Circuit Judges.

**MERRITT, Circuit Judge.** The question in this diversity case under Delaware law is whether an employer must pay the legal bills of a former employee. Plaintiff Autumn Lee Tangas worked for years representing International House of Pancakes ("IHOP") and its parent corporation, DineEquity, Inc., to restaurant franchises in the Midwest. IHOP terminated her employment when the FBI investigated a franchise owner in her assigned territory for money laundering and hiring undocumented workers. The owner and Tangas were indicted as co-conspirators, but the government dismissed the charges against Tangas. Because the dismissed charges related to her duties as a representative, Tangas claims that IHOP or DineEquity should

indemnify her as promised in their respective governing documents. The Defendants say Tangas acted in bad faith and is not covered by their indemnification provisions.

Legally, we must decide whether the District Court correctly analyzed the two employment documents containing IHOP's promises to indemnify certain covered employees. *See Tangas v. Int'l House of Pancakes, LLC*, 298 F. Supp. 3d 1116 (N.D. Ohio 2018). Their interpretation presents a close question. Moreover, if one or both of these documents cover Tangas, IHOP contends that she forfeited those rights by acting in bad faith. Because we conclude that the District Court did not interpret the employment contracts correctly as a matter of state law and, further, that there is a genuine dispute of material fact concerning Tangas's conduct, we vacate the District Court's order granting summary judgment to IHOP and remand this case for trial.

## I. FACTUAL & PROCEDURAL BACKGROUND

IHOP is a Delaware limited liability corporation that franchises restaurants serving breakfast foods and, famously, pancakes. Like many other food chains in the United States, IHOP's business model rests on a central restaurant blueprint that is replicated by local franchise owners. IHOP itself is a subsidiary of another Delaware corporation, DineEquity, Inc., which also owns the Applebee's chain. These corporate entities are governed by an LLC Operating Agreement (IHOP) and corporate bylaws (DineEquity). These documents are the source of any rights Tangas may hold.

Tangas worked for IHOP for more than two decades, first as an Operations Consultant, then as Regional Manager of Operations Services, and finally as a Franchise Business Consultant. Franchise Business Consultants work on behalf of IHOP to help franchisees improve profits and liaise between the corporation and local franchise owners. In 2009, Tangas was named "IHOP Franchise Business Consultant of the year." The District Court found that Tangas "helped

franchisees boost sales and ensured that they adhered to IHOP operating standards." *Id.* at 1120. Tangas's role is important – she was representing the corporation in the field. The basic premise of a franchise-centered business is that each individual franchise will provide the same service and food. The person ensuring that corporate standards are met is a crucial figure in this business.

One of the franchisees in Tangas's territory was a man named Terek Elkafrawi, known as Terry Elk, who owned several IHOP franchises in the Toledo, Ohio area. The exact nature of the relationship between Elk and Tangas is unclear. The District Court found that Tangas had reported Elk as a problem franchisee to IHOP corporate because she suspected he was under-reporting sales. At the least, Tangas and Elk had a professional connection. But Tangas's domestic partner, Lisa Ross, was a friend of Elk's apart from Tangas's work relationship. Ross declared in a summary judgment affidavit that she was friends with Elk, but that Tangas had always "held him at arm's length" because of their (Elk and Tangas's) working relationship.

In 2004, Ross and Elk exchanged large sums of money. The District Court said that "[t]here is conflicting evidence as to the true purpose of this transaction." *Id.* at 1121. Tangas and Ross's version of events is that Ross, without Tangas's knowledge, withdrew $50,000 from Ross and Tangas's joint bank account and loaned it to Elk. When Tangas discovered the transaction, she was upset because it created a conflict with respect to her role as the Franchise Business Consultant. Because she oversaw franchises, Tangas was not allowed to own a financial stake in a franchise. Ross asked Elk to return the money, and he did so, including an extra $8,000 in what he called "interest." Ross then returned the extra $8,000 to Elk. Other evidence suggested that this transaction was an improper investment by Tangas in Elk's business to put Ross on an Elk franchise healthcare plan. *Id.* This back and forth—whatever its true purpose—took place in 2004. What we know is that Tangas oversaw Elk's franchises and reported him as a problem to

corporate. And in 2004, a transaction of unknown purpose occurred between Elk, Tangas, and Ross, its existence was unknown to IHOP, and eventually the money returned to its original holder.

Years later, in September 2011, the FBI raided Elk's IHOP locations. FBI agents came to Tangas's home and asked her questions about Elk's business. Tangas had the impression after the interview that she was in trouble. That same day, she spoke with Christine Son, the in-house counsel of IHOP's parent company DineEquity, who told Tangas that as an IHOP employee, Tangas had no choice but to divulge the details of the FBI interview to her. Tangas did so, even though the agents had asked her not to discuss their conversation. IHOP, therefore, was informed quickly and thoroughly about the FBI's investigation into the Elk franchises.

In February 2012, Son asked Tangas to come to IHOP's headquarters in California for an interview as part of IHOP's internal investigation into the Elk matter. Tangas's attorney told Son that the U.S. Attorney's Office considered Tangas herself the subject of a criminal probe. Accordingly, Tangas's lawyer told Son that Tangas would invoke the 5th Amendment in response to questions "in any collateral matters." Son replied that IHOP's Global Code of Conduct required Tangas to cooperate and that her employment would be terminated if she refused. When Tangas's attorney reiterated that Tangas would not respond to questions, IHOP terminated Tangas for violating IHOP's Global Code of Conduct. Whatever the Code of Conduct said, Tangas and her lawyer's decision to focus on the criminal inquiry is understandable. When a client is faced with potential criminal liability in a federal investigation, the lawyer's job is to limit the client's exposure. Admissions in a collateral investigation could hurt the client later in the criminal proceeding.

The U.S. Attorney's Office indicted Elk, Tangas, and sixteen others in May 2012.[1]  The indictment listed counts of money laundering and hiring undocumented workers at Elk's IHOP locations.  Relevant here, the indictment alleged that Tangas conspired with Elk to shield him from IHOP's scrutiny in return for putting "L.R." (Lisa Ross) on the payroll and health insurance roster of an Elk franchise.  Tangas testified in her deposition in this case that the charges "flabbergasted" her, that none of the allegations against her were true, and that she was the only defendant whose charges were dismissed without a plea.  In May 2014, the U.S. Attorney's Office dismissed all charges against Tangas without prejudice.  She incurred roughly $130,000 in legal fees and used her retirement savings to pay her attorney.

In July 2015, Tangas sued IHOP and its parent company, DineEquity, in Ohio state court, alleging that she was wrongfully terminated and seeking indemnity for her attorneys' fees in the Elk matter.  IHOP removed the case to the Northern District of Ohio and filed a 12(b)(6) motion.  The District Court allowed Tangas to amend her complaint to state a claim for indemnity under Delaware rather than Ohio law.  *See Tangas v. Int'l House of Pancakes LLC*, No. 3:15–CV–1566, 2016 WL 614006, at *4 (N.D. Ohio Feb. 16, 2016).  Both parties filed a motion for summary judgment.  Tangas did not oppose IHOP's motion for summary judgment on the wrongful termination claim. 298 F. Supp. 3d at 1124, n.1.  So the sole issue remaining on summary judgment was indemnity.  The District Court granted summary judgment to IHOP and agreed that Tangas was not entitled to indemnification.  *Id.* at 1132.

The District Court came to several conclusions in its summary judgment order.  First, it said that Tangas was not entitled to indemnity under the bylaws of DineEquity, IHOP's parent corporation.  Second, it found that Tangas was not entitled to indemnity under IHOP's LLC

---

[1] *United States v. Elkafrawi, et al.*, Docket No. 3:12-cr-00262-BYP (N. D. Ohio May 22, 2012).

Agreement. The Court also applied the business judgment rule to IHOP's decision to fire Tangas and concluded that "no reasonable jury could find that IHOP failed to undertake an adequate investigation and make a reasoned decision that Tangas's fraudulent conduct 'with respect to' the criminal case extinguished any right to indemnification." *Id.* at 1132. This appeal followed.

## II. LEGAL ANALYSIS

The question presented in this case is whether the District Court correctly granted summary judgment to IHOP on Tangas's indemnity claim. The District Court's basis for so ruling was the conclusion that the governing documents of Tangas's employer do not cover her claim for indemnity. Those documents are the IHOP LLC Agreement and the bylaws of DineEquity, Inc. Our review is *de novo*, and we may not resolve any issues of disputed fact. *Williams v. Mehra*, 186 F.3d 685, 689 (6th Cir. 1999); *Felix v. Young*, 536 F.2d 1126, 1130 (6th Cir. 1976). Because we disagree with the District Court's interpretation of the agreements and Delaware law, we vacate the judgment of the District Court. These parties do not agree on how Tangas's conduct affects her rights under these contracts, and this genuine dispute of material fact precludes summary judgment. We analyze the contracts in this opinion, but a trier of fact must measure Tangas's conduct and ask if her actions amount to bad faith.

Certain basic principles inform our review of the DineEquity bylaws and the IHOP LLC Agreement. Delaware affords corporations a great deal of latitude in how indemnification rights are granted to employees and directors. Del. Code Ann. tit. 8, § 145. The Delaware General Corporation Law "*requires* a corporation to indemnify a person who was made a party to a proceeding by reason of his service to the corporation" and is successful in that proceeding, and the statute "*prohibits* a corporation from indemnifying a corporate official who was not successful in the underlying proceeding and has acted, essentially, in bad faith." *Hermelin v. K-V Pharm.*

*Co.*, 54 A.3d 1093, 1094 (Del. Ch. 2012). Between the extremes of success and bad faith, a corporation has discretion to define its indemnification obligations by charter, bylaw, or contract. *Id.* at 1095.

A bedrock principle of Delaware law is that indemnity is designed to insulate corporate employees from unjustified claims: it allows officers to do their jobs while litigation might be pending. One commentator noted:

> The invariant policy of Delaware legislation on indemnification is to promote the desirable end that corporate officials will resist what they consider unjustified suits and claims, secure in the knowledge that their reasonable expenses will be borne by the corporation they have served if they are vindicated.

*Hibbert v. Hollywood Park, Inc.*, 457 A.2d 339, 343–44 (Del. 1983) (internal quotation marks omitted); *see also Hermelin*, 54 A.3d at 1094. Indemnity in Delaware is designed for precisely the kind of case that Tangas became involved in, where the charges against her were later dismissed. The promise of indemnity allows a corporate official the opportunity to continue work untroubled by an unsubstantiated claim. The *Hermelin* case is particularly instructive in applying these principles.

Both governing documents in this case contain expansive provisions to indemnify various corporate actors. *See Hermelin*, 54 A.3d at 1095 (discussing contractual means of indemnity). We will analyze each document, but they share a common linguistic feature. Both the DineEquity Bylaws and the IHOP LLC Agreement employ the directive language "shall" in discussing when the corporate entity must indemnify covered people. The documents direct the corporation to indemnify covered persons when possible. Thus, "the discretion of the decision-maker [as to whether to grant indemnity] is very much circumscribed." R. Franklin Balotti and Jesse A. Finkelstein, 1 Del. L. of Corp. and Bus. Org. § 4.12 *Indemnification*, 2006 WL 2450248 (3d ed., 2018 Supp.) (citing *VonFeldt v. Stifel Fin. Corp.*, No. 15688, 1999 WL 413393, at *3 (Del. Ch.

June 11, 1999) ("By using the phrase 'shall indemnify,' the bylaw not only mandates indemnification; it also effectively places the burden on [the corporation] to demonstrate that the indemnification mandated is not required.")); *see also Stockman v. Heartland Indus. Partners, L.P.*, Nos. 4227–VCS, 4427–VCS, 2009 WL 2096213, at *13 (Del. Ch. July 14, 2009) ("[I]n the case of a mandatory indemnification provision, the burden rests on the party from whom indemnification is sought to prove that indemnification is not required."). This choice of phrasing suggests that in a dispute like this, where the corporation is trying to deny indemnification, the burden is on the corporation to show it should not pay.

### A. Indemnity Under DineEquity's Bylaws

DineEquity is a Delaware corporation and its bylaws set forth the terms for indemnity. The bylaws state that the corporation:

> **shall** indemnify **any person** who was or is a party or is threatened to be made a party to **any threatened, pending** or completed action, suit or proceeding, whether civil, **criminal**, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a director or officer of the Corporation, or **is or was serving at the request of** the Corporation as a director, officer, **employee** or agent of **another corporation**, partnership, joint venture, trust, employee benefit plan or other enterprise, against expenses (**including attorneys' fees**) judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding **if he acted in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation**, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful.

(emphasis added). This provision is a broad grant of indemnity rights. It is directive, employing the word "shall," and contemplates a wide range of proceedings. It is explicit in providing indemnity to former employees, using the words "is or was." The parties agree that Tangas was never an "officer" or "director" of DineEquity. So the question under this agreement is whether

Tangas "served [IHOP, a DineEquity subsidiary] at the request of" DineEquity. If she served IHOP at the request of DineEquity, then she is covered.

We disagree with the District Court's conclusion that "an employee of a subsidiary company serves 'at the request of' its parent company only when the parent company appoints the employee to a specific position." 298 F. Supp. 3d at 1125. Delaware courts have found an employee of a subsidiary corporation served "at the request of" the owner of the parent company even when not appointed to a specific position. *See Zaman v. Amedeo Holdings, Inc.*, No. 3115–VCS, 2008 WL 2168397, at *19 (Del. Ch. May 23, 2008). Moreover, in *VonFeldt v. Stifel Financial Corp.*, 714 A.2d 79, 82–83 (Del. 1998), the Delaware Supreme Court said that the exact nature of the parties' relationship—and thus the answer to the question of whether an employee served one corporation at the request of another—was a factual determination. Under Delaware law, a trier of fact must evaluate Tangas's status under DineEquity's bylaws.

We agree with the District Court that Tangas could be characterized primarily as an employee of IHOP. IHOP paid her salary, issued her a W-2, and her supervisors were IHOP employees. But Tangas points to her receipt of a service award displaying both IHOP and DineEquity's logos, the fact that DineEquity's legal team fired her, and that she was fired for violating DineEquity's Code of Conduct as proof that she was serving IHOP at the request of DineEquity. The District Court found these facts unconvincing but conceded that DineEquity and IHOP share services, including legal services. 298 F. Supp. 3d at 1126. Tangas also argued on summary judgment that the then-CEO of IHOP, Julia Stewart, who is now the CEO of DineEquity, came to Toledo, Ohio, and specifically met with Tangas to discuss her job and to assist Tangas in bringing Elk's IHOP branches into compliance with IHOP's basic standards for franchises.

Tangas also points to a letter from Julia Stewart in the DineEquity Code of Conduct, which casts DineEquity and IHOP as one entity.

Summary judgment was not the stage to resolve these disputes of material fact. The essence of Tangas's job description undercuts the conclusion that no reasonable jury could find that Tangas served IHOP at the request of DineEquity. It was Tangas's responsibility to ensure uniformity amongst franchises and report back to corporate. From her perspective, DineEquity wanted her to represent "the company" (legal distinctions aside) in the field. In an ecosystem of franchisees with a central entity, Tangas represented and acted on behalf of the central entity. It is thus not clear to us on this record that Tangas was necessarily *not* serving IHOP at the request of DineEquity. *VonFeldt*, the seminal case on this issue, held that the inquiry is a factual one. *See VonFeldt*, 714 A.2d at 85 ("Other cases will have to be decided on their own facts concerning what constitutes one corporation's request to serve another corporation."). *Cf. Narayanan v. Sutherland Glob. Holdings Inc.*, No. 11757–VCMR, 2016 WL 3682617, at *13 (Del. Ch. July 5, 2016) (post-trial finding that plaintiff served at the request of different entity).

In addition to resolving factual disputes over whether Tangas was serving IHOP at the request of DineEquity, a trier of fact must also examine whether Tangas acted in good faith. The DineEquity bylaws condition indemnification on the indemnitee "[acting] in good faith and in a manner he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had no reasonable cause to believe his conduct was unlawful." Good faith is also a legal prerequisite for indemnification. *Sun-Times Media Grp., Inc. v. Black*, 954 A.2d 380, 404, n.93 (Del. Ch. 2008) ("[A]s far as [Del. Code Ann. tit. 8] § 145 is concerned, Delaware corporations lack the power to indemnify a party who did not act in good faith or in the best interests of the corporation.") (quoting *VonFeldt*, 1999 WL 413393, *2);

*Majkowski v. Am. Imaging Mgmt. Servs., LLC*, 913 A.2d 572, 586 (Del. Ch. 2006) ("[A]n indemnification dispute generally cannot be resolved until after the merits of the underlying controversy are decided because the good faith standard requires a factual inquiry into the events that gave rise to the lawsuit."). Here, Tangas is seeking indemnity for her legal fees in the Elk matter, in which the charges against her were dismissed. But she may have contributed to the appearance of malfeasance through the confusion with the Ross-Elk loan. Even if Tangas was serving IHOP at the request of DineEquity, her conduct could still vitiate her rights to indemnification. The parties disagree on basic facts, but a trier of fact could easily conclude that Tangas served IHOP at the request of DineEquity, acted in good faith, and had no cause to believe her conduct unlawful—not least because the U.S. Attorney decided her criminal liability in the Elk matter was zero.

The Delaware statute discussing corporate indemnity articulates a policy favoring indemnity for former officers and directors. Del. Code Ann. tit. 8, § 145(c). Although this suit does not relate to statutory indemnity under § 145(c), Delaware courts have consistently held that dismissal of charges in a criminal proceeding is by definition a success on the merits. *See Hermelin*, 54 A.3d at 1107–09. Nevertheless, dismissal does not carry the day for Tangas on the issue of bad faith. She may be legally blameless, but there are disputes of material fact as to whether she acted in good faith. In the permissive contractual indemnity context, a trial is necessary on the issue of good faith in some cases. *Id.* at 1111–14. This case is one of them.[2]

As to the DineEquity bylaws, on remand the District Court must hold a trial to assess whether: (a) Tangas was serving IHOP at the request of DineEquity, and (b) whether Tangas's

---

[2] As discussed later, Delaware cases have not consistently said that a trial on the issue of good faith is necessary in indemnity cases interpreting contracts or LLC Agreements containing indemnity rights. The District Court should follow *Hermelin* in resolving these issues of good faith as to both the DineEquity bylaws and the IHOP LLC Agreement, discussed in a separate section.

actions vitiated whatever rights she held under that agreement. In determining whether Tangas was serving IHOP at the request of DineEquity, the trier of fact must examine the specific facts regarding Tangas's service to the company, including her interactions with the CEO. *VonFeldt* is clear that each case must be decided on its facts, but we also read *VonFeldt* to mean that in a contractual indemnity case—where a right to indemnity comes from a contract rather than a statute—what a corporation says matters. "If a corporation wishes not to extend indemnification rights to those who serve elsewhere at its request, it can say so in its bylaws, or it can say nothing at all, thereby achieving the same result." *VonFeldt*, 714 A.2d at 86. DineEquity did not have to provide contractual indemnification rights to anyone. But it did. A trial is necessary on these components of the indemnity claim.

## B. Indemnity under IHOP's LLC Agreement

The second avenue for Tangas to secure indemnity is through the IHOP LLC Agreement. With respect to indemnity, the IHOP LLC Agreement provides:

> **To the fullest extent permitted by law**, the Company **shall** indemnify and hold harmless each Covered Person from and against **any and all** losses, claims, demands, liabilities, expenses, judgments, fines, settlements and other amounts arising from any and all claims, demands, actions, suits or proceedings, civil, **criminal**, administrative or **investigative** ('Claims'), in which the Covered Person may be involved, or threatened to be involved, as a party or otherwise, by reason of its management of the affairs of the Company or which relates to or arises out of the Company or its property, business or affairs. A Covered Person shall **not** be entitled to indemnification under this Section 8.2 with respect to (i) **any Claim with respect to which such Covered Person has engaged in fraud, willful misconduct, bad faith or gross negligence** or (ii) any Claim initiated by such Covered Person unless such Claim (or part thereof) (A) was brought to enforce such Covered Person's rights to indemnification hereunder or (B) was authorized or consented to by the Member. Expenses incurred by a Covered Person in defending any Claim shalt be paid by the Company in advance of the final disposition of such Claim upon receipt by the Company of an undertaking by or on behalf of such Covered Person to repay such amount if it shall be ultimately determined that such

Covered Person is not entitled to be indemnified by the Company as authorized by
this Section 8.2.

(emphasis added). The Agreement defines a "Covered Person" as "the Member, or any officers,

directors, stockholders, partners, **employees**, affiliates, representatives or agents of any of the

Member, nor any officer, employee, representative or agent of the Company." (emphasis added).

This section is another broad grant of indemnity applying to many different actors. The parties

agree that Tangas was a "Covered Person" until March 2, 2012, the date of her termination. IHOP

argues that after she was fired, Tangas was no longer entitled to indemnity.

There are four legal issues bearing on this agreement: (a) Tangas's status as a "former"

employee under the agreement; (b) whether her rights to indemnity vested at some point;

(c) whether the business judgment rule applies to IHOP's conclusion that Tangas had acted in bad

faith; and (d) the issue of bad faith itself. We conclude that the LLC Agreement made promises

to Tangas that vested, and on remand the District Court must hold a trial as to whether Tangas's

actions constitute bad faith, which would cause a forfeiture of her rights. As with the DineEquity

bylaws discussed above, the problem is that the parties in this case disagree about whether

Tangas's conduct—to be exact, her conduct with respect to the Elk-Ross transaction and her degree

of cooperation with IHOP in 2011 and 2012—should affect her rights. The District Court must

resolve this issue.

### a) Current Versus Former Employees

Because most of Tangas's legal bills were incurred after her termination, one basic question

is whether the language in the LLC Agreement includes "terminated" or "former" employees. The

definition of "Covered Person" does not say. This omission presents a murky question, but

ultimately an ancillary one. The question of coverage as a "current" versus a "former" employee

does not matter because Tangas's indemnity rights vested before her termination. We address

vesting in a separate section, but we explore the "current" versus "former" issue here because IHOP thinks that this issue decides the case. It does not.

Unlike the DineEquity bylaws,[3] the IHOP LLC Agreement says nothing about "current" versus "former" employees. The District Court found that the lack of a modifier before the list of covered persons in the IHOP LLC Agreement suggested that only current employees were eligible for indemnity. 298 F. Supp. 3d at 1128–29. The Court quoted *Charney* for this proposition. *See Charney v. Am. Apparel, Inc.*, No. 11098–CB, 2015 WL 5313769, at *7 (Del. Ch. Sept. 11, 2015) ("When the words 'officers' and 'directors' are not qualified by the adjective 'former' (or a similar adjective), Delaware courts have interpreted those words to refer to current officers and current directors."). We do not think that this quotation applies to the instant matter.

First, the quoted section of *Charney* relates to advancement rather than indemnity. "Advancement provides corporate officials with immediate interim relief from the personal out-of-pocket financial burden of paying the significant on-going expenses inevitably involved with investigations and legal proceedings." *Homestore, Inc. v. Tafeen*, 888 A.2d 204, 211 (Del. 2005). Advancement is related to indemnity, but they are distinct rights. *See Tafeen v. Homestore, Inc.*, No. 023–N, 2004 WL 556733, at *6, n.30 (Del. Ch. Mar. 22, 2004) (discussing the distinctions). Second, commentators have noted that *Charney* is not the sole authority on this point. Balotti and Finkelstein, 1 Del. L. of Corp. and Bus. Org. § 4.12 at n.496 (discussing *Charney*). We do not think that *Charney* opens a window into the mind of the drafter of the IHOP LLC Agreement, and it does not insert words into the contract. *Cf. Branin v. Stein Roe Inv. Counsel, LLC*, No. 8481–VCN, 2014 WL 2961084, at *6, n.43 (Del. Ch. June 30, 2014) ("Case law must be used cautiously

---

[3] Recall that the DineEquity bylaws clearly contemplate coverage for people who *once* served at the request of the corporation but no longer do so. The bylaws use the explicit phrase "is or was."

in searching for the intent of the parties for an indemnification provision in a limited liability company agreement.").

The District Court's reliance on *Charney* was misplaced because, as Tangas persuasively argues, "legal claims do not always present themselves immediately." Indemnity would be a hollow promise if it did not extend to former employees. Investigations and civil suits can take years before claims accrue or before a dispute morphs into litigation. Mobility would be reduced if an employee lost all the protections of indemnity after he or she has moved on to a new role. To the extent that the IHOP LLC agreement does not distinguish between current and former employees, that ambiguity should be construed against the drafter. *See, e.g.*, *Miller v. Palladium Indus., Inc.*, No. 7475–VCN, 2012 WL 6740254, at *3 (Del. Ch. Dec. 31, 2012) (noting that Delaware policy "supports the approach of resolving ambiguity in favor of indemnification and advancement."); *Greco v. Columbia/HCA Healthcare Corp.*, No. 16801, 1999 WL 1261446, at *13 (Del. Ch. Feb. 12, 1999) (holding an ambiguity in an indemnification provision against the drafter).

We also find support for the proposition that indemnity should apply to former employees in Delaware's statutes. A provision of the Delaware indemnity statute provides that statutory indemnification rights shall "continue" as to a person who is no longer an employee. Del. Code Ann. tit. 8, § 145(j) (West 2018); *see also Marino v. Patriot Rail Co.*, 131 A.3d 325, 342–43 (Del. Ch. 2016) ("The public policy foundation for advancement and indemnification rights has particular salience when lawsuits target former directors and officers for actions taken during their periods of service."). Granted, this is not a case where the party seeking indemnity is invoking some *statutory* right to indemnity. The posture of this case is focused on the rights this company gave covered persons in an LLC Agreement—an agreement, however, that mimics the language

of the statute. Delaware law clearly recognizes that the policy imperatives behind indemnity remain active even after an employee has left her post.

The question of whether this LLC Agreement contemplates indemnity for "former" employees is a close one. From a purely textual perspective, the agreement does not use the term "former." Thus, because it does not explicitly grant former employees coverage, a court should not rewrite the Agreement to confer a right that the drafter did not intend to grant. Conversely, the indemnification provision is expansive, using terms like "to the fullest extent permitted by law" and "shall." The Delaware indemnification statute also explicitly mentions former employees. We think the more logical conclusion is that former employees are included in an ambiguous LLC Agreement for the policy reasons articulated by Delaware statutory and case law.

We need not settle this issue because, as discussed below, Tangas's rights vested before her termination. But the District Court's method of resolving the "current" versus "former" problem—comparing the IHOP LLC Agreement and the DineEquity bylaws—was inapt. 298 F. Supp. 3d at 1128 ("It contrasts, rather starkly, with the language of DineEquity's bylaws . . ."). The documents are independent and were drafted differently, and while they may afford different rights, we do not think they should be read against each other. That is, we do not think that the clearer document informs the more ambiguous document by virtue of the first document's clarity. We proceed to vesting.

### b) Vesting

Regardless of the solution to the "former" versus "current" employee question under the LLC Agreement, there is a better perspective to assess whether the Agreement's indemnity provision covered Tangas after her termination. As the District Court noted, 298 F. Supp. 3d at 1129, Delaware courts have held that indemnity clauses can function as contingent rights that vest.

The District Court in particular cited two cases, *Branin*, 2014 WL 2961084, and *Salaman v. National Media Corp.*, No. 92C–01–161, 1992 WL 808095 (Del. Super. Ct. Oct. 8, 1992), but said that "it is impossible to read these cases as announcing a free-standing right to vested indemnification for any and all current and former employees of a limited liability company." 298 F. Supp. 3d at 1129. The District Court then held that the principles articulated in these cases did not extend to Tangas. We disagree.

In *Branin*, an LLC agreed to indemnify a new employee when he was sued by his former employer. A month after the new employee was sued, his new superiors at the LLC amended their corporate bylaws to exclude his claims from the indemnity provision. Ten years later, when the claims against the new employee were finally dismissed, he sought indemnity under the LLC's original and amended bylaws. The Delaware Chancery Court concluded that the initial, unaltered indemnity provision functioned to confer on the employee "an enforceable right to indemnification that vests in accordance with the terms of the agreement and thereafter may not be rescinded by amendment of the operating agreement." *Branin*, 2014 WL 2961084, at *8.

The District Court distinguished *Branin*: "*Branin* simply did not address the issue that this case presents: whether a fired employee remains entitled to indemnification even after her firing, when she is no longer a 'Covered Person.'" 298 F. Supp. 3d at 1130. In a general sense, that statement is accurate. But the principles that *Branin* articulated – namely, that an indemnification provision can be viewed as a right that vests – apply squarely to Tangas's situation. When did Tangas need indemnification (part of the benefit of the bargain) most? When the U.S. Attorney and the FBI came to call. And in fact, despite her indictment, her conduct was later deemed not criminal. And the claim against her arose in the course of her employment at the company. As in *Branin*, the indemnifying corporation reneged on its promise when that promise mattered most.

The *Salaman* case addressed a similar fact pattern, and it also characterized the plaintiff's indemnity rights as "vested contract right[s]." *Salaman*, 1992 WL 808095, at *6.

*Branin* and *Salaman* both concerned high-level employees or directors who were seeking indemnity. It is true that these cases do not announce that *all* indemnity provisions *everywhere* function as rights that vest. But corporations offering indemnity rights are bound to deliver that benefit when a covered person is targeted, presuming of course that the employee acted in good faith. Otherwise, a corporation could simply fire anyone under investigation, rendering indemnity provisions a nullity. This inequity is exactly what Delaware law guards against. When the FBI came to Tangas's door, her indemnity rights vested because the LLC Agreement is written expansively to contemplate coverage for threatened and investigative actions. Indemnity is designed for precisely this situation when an employee is sued and is later found not guilty or not liable. The distinction between "former" and "current" employees is irrelevant because Tangas's rights vested under the Agreement when the FBI began investigating her and before IHOP fired her.

### c) The Business Judgment Rule

According to IHOP, even if Tangas was entitled to indemnity under the LLC Agreement, her bad conduct bars her indemnification claim. Recall that the IHOP LLC Agreement states: "A Covered Person shall not be entitled to indemnification under this Section 8.2 with respect to (i) any Claim with respect to which such Covered Person has engaged in **fraud, willful misconduct, bad faith or gross negligence**." (emphasis added). IHOP argues that Tangas did two things that bar her claim: (a) failing to report the $50,000 Elk transaction to her superiors as a conflict of interest in 2004, and (b) failing to cooperate in the internal IHOP investigation in 2011 and 2012. These two actions, IHOP says, amount to fraud, willful misconduct, and bad faith under the LLC

Agreement. Further, IHOP asserts that it is entitled to deference on its determination that Tangas engaged in these activities.

After motions for summary judgment were filed, the District Court asked the parties for supplemental briefing on whether it would be appropriate to defer to IHOP's finding that Tangas engaged in fraud. In its summary judgment ruling, the Court applied the business judgment rule to conclude that no reasonable jury could challenge IHOP's decision. 298 F. Supp. 3d at 1130–31. We disagree with this means of analyzing the case. If a corporation is entitled to deference in reneging on its promise to indemnify an employee, then its promise is meaningless.

In general, the business judgment rule in Delaware allows the board of a corporation to make a business decision without second-guessing by courts. *See generally In re Orchard Enterprises, Inc. Stockholder Litig.*, 88 A.3d 1, 33–34 (Del. Ch. 2014). Put simply, the business judgment rule is irrelevant to this case because there is no decision over which a corporation's board could exercise its business judgment. A legal question of contract interpretation is not within a board's purview. *Grimes v. Donald*, No. 13358, 1995 WL 54441, at *7 (Del. Ch. Jan. 11, 1995) ("The question whether these contracts are valid or not does not fall into the realm of business judgment; it cannot be definitively determined by the informed, good faith judgment of the board. It must be determined by the court."); *see also* 18B Am. Jur. 2d Corporations § 1452 ("The business judgment-rule also does not apply to a decision which construes and applies a statute and a corporate bylaw. Nor does it allow a board of directors to rewrite a contract to expand its own discretionary authority and diminish the contractual rights and protections given the other party.").

The business judgment rule applies to indemnification only if there is no contract on point. Here, there is a contract on point. In fact there are two: the LLC Agreement and the DineEquity bylaws. *Cf. Palladium Industries,* 2012 WL 6740254, at *3 ("However, *absent* a bylaw or

contractual provision that makes advancement mandatory, Delaware law leaves the decision to advance expenses to the business judgment of the board." (emphasis added)). The business judgment rule might be relevant in an indemnity context if the bylaws or operating agreement make indemnity discretionary. That is not true here because the drafter of the LLC Agreement employed the word "shall." We do not think the business judgment rule applies in this case.

### d) Bad Faith

Even if the business judgment rule does not apply, IHOP still claims that Tangas is not entitled to indemnity, effectively, because she broke the rules with regard to the Elk transaction and cooperating with management in 2011 and 2012. Both issues are hotly disputed by the parties. *Compare* Tangas's Brief at 10–11 (Elk transaction), 35–36 (cooperation), *with* IHOP's Brief at 4–5 (Elk transaction), 5–7 (cooperation). Again, the LLC Agreement contains language that specifically cabins IHOP's ability to deny a Covered Person indemnity: "A Covered Person shall not be entitled to indemnification under this Section 8.2 with respect to (i) any Claim **with respect to which** such Covered Person has engaged in fraud, willful misconduct, bad faith[,] or gross negligence." (emphasis added). The simple intent of this passage is to ensure that a Covered Person cannot seek indemnity with unclean hands. Tangas argues that because the indictment is the "claim" at issue, she has done nothing wrong *with respect to* that claim. In other words, Tangas says, concealing the Elk transaction and refusing to cooperate in IHOP's internal investigation, even if established, would not relate to the charges in the indictment.

As to the Elk transaction, it is difficult to argue that the exchange is factually unrelated to the federal indictment, which specifically discusses it as a part of a broader scheme that admittedly, was never proven as to Tangas. The nature of this transaction is a material dispute of fact. If a jury finds that Tangas's version of events is true, then there is no misconduct because she acted to

remedy the conflict before it became an issue by telling Ross to get the loaned money back from Elk. Years passed without further event, and any belated criminal charges referencing that transaction were dismissed. If a jury instead believes IHOP's version of events – that the transaction was an undocumented and improper investment in a franchise – then it could relate to the claim because it was part of a scheme that could harm the company. Even if no criminal liability attached, Tangas's conduct could still bespeak "fraud, willful misconduct, bad faith[,] or gross negligence."

With regard to Tangas's involvement with IHOP's internal investigation, the record is again disputed as to whether she cooperated. Tangas certainly discussed her initial meeting with the FBI with counsel for IHOP when the agents explicitly told her not to. The fact that she communicated with counsel for IHOP about the meeting quickly could show that she cooperated. As to the meeting at IHOP's headquarters, the reasoning behind Tangas's attorney's hesitations is apparent. When a client is faced with potential criminal liability, ancillary investigations with potential admissions can lead to legal problems for the client. Conversely, IHOP was beginning its own internal investigation just as Tangas's cooperation ebbed. Tangas signed a document saying she would cooperate and then arguably did less than she could have. A trier of fact must hold these two perspectives side by side and compare them. Even if an indemnitee succeeds in defending a claim, then bad faith, willful misconduct, or the like might still be present, justifying withholding of indemnity.

There are different perspectives in Delaware as to when a proceeding examining good faith is required. The *Stockman* case held that "when the criminal charges against an Indemnitee are dismissed without any finding of liability, the contract argument for examining what the Indemnitee did and whether the Indemnitee acted with an innocent state of mind is arguably

irrelevant as there is no underlying violation to examine." *Stockman*, 2009 WL 2096213, at *17; *see also Meyers v. Quiz-DIA LLC*, No. 9878–VCL, 2017 WL 2438328, at *8 (Del. Ch. June 6, 2017) (holding that when an indemnity provision used "to the fullest extent permitted by law" language, there was no need to show good faith). These cases suggest that if there is no underlying criminal liability, an agreement's expansive language creates a presumption of good faith. Other authority concludes otherwise. *See Hermelin*, 54 A.3d at 1113 ("Thus, additional discovery—in some instances mimicking the very litigation avoided by the settlement—may be required to permit a determination on whether the indemnitee acted in good faith."); *Branin*, 2014 WL 2961084, at *10 (holding that there was a dispute of material fact over good faith).

We think that the deliberate inclusion of the good faith requirement in both the LLC Agreement and the DineEquity bylaws is crucial in effectuating the intent of the drafter, especially in a case like this where the parties dispute the facts. *Cf. Owens Corning v. Nat'l Union Fire Ins. Co. of Pittsburgh*, 257 F.3d 484, 496 (6th Cir. 2001) ("Given that this presumption of good faith stands unrebutted by the party ultimately made responsible, the indemnification proceeded 'according to law,' and was not made in breach of the Policy.") (applying Delaware law). IHOP is not entitled to deference on the good faith question because its indemnification procedures are directive and broad. But holding that the dismissal of Tangas's charges satisfies the good faith provision would render the provision of the LLC Agreement discussing misconduct a nullity. Thus, a trial is necessary.

### e) Scope of Remand

On remand, with respect to the IHOP LLC Agreement, the crucial question is whether Tangas's actions fall under the bad faith clause of the Agreement that eliminates indemnification for bad faith actors. The Agreement says: "A Covered Person shall not be entitled to

indemnification under this Section 8.2 with respect to (i) any Claim with respect to which such Covered Person has engaged in fraud, willful misconduct, bad faith or gross negligence." A trier of fact must ask whether Tangas's actions in the Ross-Elk transaction and in the internal investigation amount to fraud, willful misconduct, bad faith, or gross negligence with respect to the federal indictment (the claim at issue). There is no need for the District Court to revisit the "former" versus "current" employee question because Tangas's rights vested before her termination.

## III.    CONCLUSION

Delaware public policy is clear that indemnity is one of the most important promises that a corporation can make to an employee. It protects the covered person from defending frivolous claims so that the covered person's work for the corporation may continue. Delaware also affords corporations formed under its laws a great deal of latitude in structuring indemnity procedures. IHOP and DineEquity made conscious choices to create expansive indemnification rights in their governing documents. We agree that Tangas is not necessarily entitled to protection under these rights because of her actions. But these disputed issues of fact must be presented to a jury. For the foregoing reasons, we **VACATE** the orders of the District Court and **REMAND** this case for further proceedings consistent with this opinion.